Crystal Foley (SBN 224627)
cfoley@simmonsfirm.com
**Simmons Hanly Conroy LLC**
100 N. Pacific Coast Highway
Suite 1350
El Segundo, CA 90245
Telephone: (310) 322-3555
Facsimile: (310) 322-3655

Matthew E. Lee (*pro hac vice*)
Jeremy R. Williams (*pro hac vice*)
**WHITFIELD BRYSON & MASON, LLP**
900 W. Morgan Street
Raleigh, NC 27603
Telephone:     919-600-5000
Facsimile:     919-600-5035
matt@wbmllp.com
jeremy@wbmllp.com

[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID SWAFFORD, | Case Number: 5:18-cv-4916 |
| Plaintiff, | **PLAINTIFF DAVID SWAFFORD'S SECOND AMENDED COMPLAINT** |
| vs. | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | |
| Defendant. | |

Plaintiff David Swafford, complaining of the acts of Defendant International Business Machines Corporation ("IBM"), alleges and states the following:

---

1

PLAINTFF'S SECOND AMENDED COMPLAINT                    Case No. 5:18-cv-04916-LHK

# INTRODUCTION

1.      Plaintiff files this Second Amended Complaint in response to the Court's order of April 17, 2019, in which the Court denied the majority of IBM's motion to dismiss, granted the motion in part with prejudice, and granted the motion in part without prejudice and with leave for Plaintiff to amend.  This Second Amended Complaint is designed to address the issues raised by the Court in granting the motion to dismiss in part without prejudice and with leave to amend.

2.      For years, IBM has perpetrated an institutional bait-and-switch with how it pays commissions to sales representatives. Throughout IBM's messaging to them, from how it directs managers to explain commissions to how it uses presentations to highlight the program features, IBM consistently and repeatedly represents that commissions are uncapped. Indeed, IBM's Rule 30(B)(6) witness admitted under oath in a deposition in a similar lawsuit that IBM has "an obligation" not to cap sales representatives' commissions payments and that it's reasonable for sales representatives to rely on that.

3.      IBM tells sales representatives that ["they"] can make a million dollars!" and that their income is limited only by how much they are able to sell. But that's not the truth. The truth is that IBM frequently does cap commissions. And IBM intentionally misleads sales representatives about the program because it knows that an "uncapped commissions" program is highly motivating to sales representatives and incentivizes them to pursue big deals. On the contrary, capping commissions de-motivates sales representatives because when they reach the cap they can't make any more commissions no matter how big the deal is. And, since a big deal is often extraordinarily difficult to close, requiring long hours and repeated out-of-town travel, IBM knows that being honest about its capped commissions program would significantly limit the number of those big deals.

PLAINTFF'S SECOND AMENDED COMPLAINT                    Case No. 5:18-cv-04916-LHK

4.      For years, IBM has known that sales representatives, and even managers, believe IBM when it says commissions are uncapped. In fact, the IBM department that handles capping frequently gets calls from sales representatives and managers that are upset about getting capped after being told that IBM does not cap commissions. Yet, IBM does nothing to attempt to eliminate the problem by explaining its real practice.

5.      The reason IBM doesn't attempt to explain that it caps commissions is simple: profit. As it stands, IBM is able to have its cake and eat it too because it can successfully motivate its sales team to pursue the big deal for IBM, but never have to pay a fair commission for the extraordinary effort the sales representative expended to close it.

6.      Plaintiff David Swafford is another victim of IBM's blatant misrepresentations and doubletalk about uncapped commissions. He has filed this action to recover the damages he's incurred from IBM's wrongful capping of his sales commissions and to stop IBM's deceptive and unlawful practice.

**PARTIES**

7.      Mr. Swafford is a citizen of Los Gatos, California residing in Santa Clara County.

8.      IBM was incorporated, and is existing, under the laws of the State of New York. IBM's principal place of business is in the State of New York.

**JURISDICTION AND VENUE**

9.      Subject matter jurisdiction over this matter is conferred upon and vested in this Court under 28 U.S.C. § 1332.

10.      This Court has personal jurisdiction over IBM.

11.      Venue is proper in this Court.

PLAINTFF'S SECOND AMENDED COMPLAINT                    Case No. 5:18-cv-04916-LHK

12.     This action has been brought within all applicable statute of limitations and/or repose.

## FACTUAL ALLEGATIONS

13.     Mr. Swafford is a seasoned software sales representative that has worked at IBM since 2009.

14.     Mr. Swafford joined IBM on or about February 2, 2009 after the company he had been working for as a software sales representative was acquired by IBM.

15.     During his tenure with IBM Mr. Swafford was very successful and highly respected in his position and received positive ratings in every performance review. He received awards for 100% quota club (meaning he met or exceeded his quota), an award for five consecutive 100% quota club awards, and in 2017 was awarded the Benelux Sales Excellence Award.

## IBM Promised Mr. Swafford His Commissions Were Uncapped.

16.     Mr. Swafford's compensation as an IBM sales representative consisted of a base salary paired with uncapped commissions. In 2016, Mr. Swafford's commissions consisted of a tiered, uncapped commission based on Mr. Swafford's attainment as a percentage of his target incentive achieved.

17.     During his time at IBM, Mr. Swafford and other sales representatives regularly received PowerPoint presentations describing the terms of the commission plans being offered to them. These PowerPoints consisted of over 200 pages worth of slides, and are collectively referred to as the "Educational Materials." Each year, the Educational Materials explained that sales commissions were uncapped. Nowhere in the Educational Materials is there anything stating or even suggesting that sales commissions may be capped in some instances or that IBM reserves the right to cancel or modify whether and to what extent commissions may be capped. The

Educational Materials are unequivocal and state repeatedly that commissions are uncapped. was also available for Mr. Swafford, and other salespeople, to download during the entirety of the sales period (July-December of 2016) and afterwards.

18.     Mr. Swafford's commission plan for the second half of 2016 ran from July 1, 2016 through December 31, 2016. Upon information and belief, IBM did not offer the final written (electronic) commission plan to him ("the Incentive Plan Letter" or "IPL") for this sales period until December 6, 2016.

19.     During that same time period in 2016, Mr. Swafford received and reviewed a presentation (the "PowerPoint"), which constituted a portion of the Educational Materials for the second half of 2016. IBM also made the PowerPoint available for Mr. Swafford, and other sales representatives, to download during the entirety of the sales period (July-December 2016) and afterwards, as a resource that they could continually refer back to if they had any questions about their commissions. This PowerPoint constitutes a continuing representation by IBM to sales representatives, including Mr. Swafford, about how they should understand the terms of their commissions compensation.

20.     IBM made a substantially similar version of this PowerPoint available to Mr. Swafford each year for the purpose of highlighting and explaining the important terms of his compensation.

21.     The PowerPoint was titled "Our Purpose, Values & Practices" relating to "Your 2016 Incentive Plan," and it stated that the goal of the incentive plan is "to design and deliver sales incentives that motivate your performance and are strategically aligned with IBM's strategy and transformation." Page 13 specifically stated that "[e]arnings opportunity remains uncapped."  In fact, the presentation mentions no less than six times in its 18 pages that "payments" and/or "earnings opportunit[ies]" are "uncapped."

PLAINTFF'S SECOND AMENDED COMPLAINT                    Case No. 5:18-cv-04916-LHK

22.     These representations were repeated in sales meetings and by IBM managers.

23.     These representations are also in line with IBM's written guidance to its managers, which provides:

> Conditions that may lead to an adjustment include the need to correct errors or the need to balance with employee's contribution to the success of a large sales transaction (which criteria must be clearly provided to Commissions team).
>
> **Adjustments must not be done only as a ceiling or cap on the total earnings allowable to employees.**

(Emphasis added).

24.     In other words, IBM's official policies provide that sales representatives' commissions may be adjusted to correct errors, but their commissions may not be arbitrarily capped for the purpose of limiting an employee's earnings.

25.     Here, Mr. Swafford's commissions were not adjusted as a result of any errors or to balance the employee's contribution. Rather, his commissions were arbitrarily capped for the sole purpose of limiting his earnings. He was even told as much by both his first and second line managers.

### Mr. Swafford's Commission Payments Were Capped.

26.     In 2016, Mr. Swafford worked on behalf of IBM to close two large deals of IBM products and services with Oracle ("Oracle Deal") and Sabre, Inc. ("Sabre Deal"). Mr. Swafford was the sole sales representative responsible for the Oracle Deal and was one of only two sales representatives responsible for the Sabre Deal.

27.     Mr. Swafford's effort in closing the Oracle and Sabre Deals resulted in total sales of approximately $3,000,000 of IBM products and services. Mr. Swafford's achieve detail report (IBM's internal record that reflects the revenue credit attributable to Mr. Swafford) indicated that the total sales revenue attributable to him for the second half of 2016 (for all deals

PLAINTFF'S SECOND AMENDED COMPLAINT                    Case No. 5:18-cv-04916-LHK

he closed, including the Oracle and Sabre Deals) was approximately $4,983,275. His quota at the time was $512,600.

28.     On the recognized revenue credit of $4,983,275, Mr. Swafford earned a commission of $966,316 which should have been paid to him in January 2017 after the deals were closed at the end of December 2016. He was not paid any of this commission in January 2017.[1]

29.     After approaching his manager regarding this, his manager, Mark Briggs, informed him that because of the size of the deals, Mr. Swafford's commissions were going through an internal review process.

30.     Mr. Swafford was then initially told that he would be paid in full, as both his first line manager (Mr. Briggs), and second line manager (Richard Wirtenson) signed off on the commissions amount of $966,316 due to Mr. Swafford. Inexplicably, however, Mr. Swafford's third line manager, Don Leeke, did not approve the commissions payment.

31.     Mr. Swafford was then emailed by Mr. Briggs on February 23, 2017 who told Mr. Swafford that he had just been "informed by IBM that [Mr. Swafford's] attainment has been **capped** at 250% of plan." **Exhibit A** (emphasis added). The reason why? Mr. Briggs told Mr. Swafford in a phone call after that email that IBM decided it was simply too much money to pay Mr. Swafford the full commissions he had earned, and thus, IBM would be paying him only a portion of those commissions. In other words, IBM was capping Mr. Swafford's commissions to limit his earnings.

---

[1] Mr. Swafford notes that he was overpaid by $19,375 in the first half of 2016 due to an error by IBM. This overpayment was to be deducted from the commissions Mr. Swafford earned in the second half of 2016. Any discussions herein of the commissions due and paid/unpaid to Mr. Swafford disregard this $19,000.

PLAINTFF'S SECOND AMENDED COMPLAINT                    Case No. 5:18-cv-04916-LHK

32.     Shortly after this, the internal IBM system indicated that Mr. Swafford would in fact be paid in full the commissions he had earned, including those on the Oracle and Sabre Deals and that he would receive his payment via direct deposit in March 2017.

33.     However, before the payment was to be deposited, he received a call from an IBM employee informing him that he would be receiving a paper check, rather than direct deposit for these commissions.

34.     The commissions check he then received was in the amount of $153,384. When Mr. Swafford inquired about this discrepancy with Mr. Briggs, he was told that the commissions payments were still being reviewed by IBM.

35.     Mr. Swafford was then paid another $563,167 of the commissions from his sales in the second half of 2016, including the Oracle and Sabre Deals and was told that would be all that he would be paid for his work closing these two Deals. This left Mr. Swafford still owed approximately $249,765 in commissions he had earned that were arbitrarily capped by IBM.

36.     The only reason Mr. Swafford was ever provided by IBM for why he was not paid all of the commissions he had earned, was that IBM thought it was simply too much money to pay Mr. Swafford, and thus, it was unwilling to pay him in full.

37.     Indeed, after further attempts to learn why he had not been paid in full, Mr. Wirtenson, his second line manager emailed him on May 1, 2017 and said: "I made the recommendation to Don that we pay on all other deals 100% but CAP the Oracle and Sabre transactions at 150% of your quota on each." **Exhibit B** (emphasis in original).

38.     This reasoning did not make any sense to Mr. Swafford as he had clearly been promised uncapped commissions, and in fact, Mr. Swafford had earned nearly a million dollars worth of uncapped commissions the previous year and been paid every dime of them.

39.     IBM did not pay any other sales representatives the $249,765, or any part of that, that it owed to and withheld from Mr. Swafford.

**Mr. Swafford Has Recently Learned That IBM**
**Routinely Misrepresents That It Does Not Cap Commissions**

40.     Recently, Mr. Swafford has learned that IBM has a history of capping commission.

41.     The sales field in which Mr. Swafford worked for IBM is highly competitive, and most employers do not cap commissions. Were IBM to actually tell its sales representatives that commissions could be capped, it would be severely hampered in its efforts to recruit good sales representatives. As a result, IBM engages in a practice whereby it tells its salespeople that their commissions will not be capped, both verbally and in written documents like the PowerPoint presentation, and then it caps certain high-achievers after the fact.

42.     There is another case that was recently resolved in the Middle District of North Carolina that is very similar to this one, <u>Bobby Choplin v. International Business Machines Corporation</u>, No. 16-cv-1412-TDS-JEP ("the Choplin Action"). Upon information and belief, the plaintiff in the Choplin Action had an IPL that was in relevant part identical or substantially similar to Mr. Swafford's IPL, and the plaintiff was shown a PowerPoint presentation that was in relevant part identical or substantially similar to the PowerPoint presentation shown to Mr. Swafford. Furthermore, upon information and belief, many of the other facts and circumstances surrounding the commissions due to Mr. Choplin, and what IBM actually paid him and why, are similar to the facts and circumstances surrounding the commissions due to Mr. Swafford, and what IBM actually paid him and why.

43.     In the Choplin Action, the plaintiff took four depositions: (1) a Rule 30(b)(6) deposition of IBM, through corporate designee Richard Martinotti (**Exhibit C**); (2) a deposition of Mr. Choplin's first-line (i.e., immediate) manager, Thomas Batthany (**Exhibit D**); (3) a deposition

PLAINTFF'S SECOND AMENDED COMPLAINT                    Case No. 5:18-cv-04916-LHK

of Mr. Choplin's second-line (i.e., two levels up) manager, Haleh Maleki (**Exhibit E**); and (4) a deposition of Mark Dorsey, a former IBM Vice President of Software Sales (i.e., one of the highest-level sales managers in the corporation) (**Exhibit F**).  Together, Exhibits C, D, E, and F are referred to as the "Choplin Depositions." All of this testimony taken under oath in the Choplin case, including the testimony quoted below, applies equally and fully to Mr. Swafford here.

44.      The testimony in the Choplin Depositions make clear the following, among other things: (1) because of the statements in the PowerPoints, and in light of the IPLs, IBM had an "obligation" not to "cap" the commission for sales representatives like Mr. Choplin and Mr. Swafford; (2) sales representatives like Mr. Swafford were entitled to rely on the statements in the PowerPoints that their commissions would be not be "capped," and that reliance was understood by IBM and was reasonable; and (3) what IBM in fact did, when it reduced the commissions in the way that it did for Mr. Choplin and Mr. Swafford, was "capping."  For example:

a.   IBM testified as follows:

Q.  The fourth bullet point, you could read that, please.

A. "Earnings opportunity remains uncapped."

Q.  Okay. So you would agree that IBM when explaining his compensation plan for the first half of 2015 represented to Bobby Choplin that his earnings opportunity remains uncapped, wouldn't you?

A. Correct.

Q.  Would you also agree that IBM represented to Bobby Choplin regarding his first half of 2015 compensation plan that payments were uncapped?

A. Correct.

Q. So would you agree that IBM had an obligation not to cap Bobby Choplin's earnings opportunity?

A. Yes.

Q. Would you agree that IBM had an obligation not to cap Bobby Choplin's payments?

PLAINTFF'S SECOND AMENDED COMPLAINT            Case No. 5:18-cv-04916-LHK

A. Correct.

(Exhibit C, pp. 18-19.)   When asked specifically about whether a salesperson could reasonably rely on the statements in the PowerPoints, IBM testified:

> Q. And it would be reasonable for a salesperson like Bobby Choplin to rely on the information in Exhibit 65, 66 and 67 [PowerPoints] regarding their compensation plan?
>
> A. Yes.

(Exhibit C, pp. 67-68.)

b. Mr. Batthany testified as follows about the statements in the PowerPoint that commission would be not be capped:

> Q. Okay. It would be reasonable for someone to understand that their commission payments were uncapped in the first half of 2015, wouldn't it?
>
> A. Yes.

(Exhibit D, p. 79.) Mr. Dorsey similarly testified that, if he were a salesperson and read the statements in the PowerPoint, he would think that his earnings were uncapped. (Exhibit F, p. 48.)

c. Ms. Maleki testified as follows about what exactly constitutes capping:

> Q. What does that mean to you?
>
> A. Capped?
>
> Q. Right.
>
> A. Is when your commissions get reviewed, and you know, you're supposed to get paid X amount, but you get paid Y.
>
> Q. Something different than what your commission formula would produce?
>
> A. Correct.

(Exhibit E, p. 25.)

d. Mr. Dorsey straight-up testified that IBM's statements in the PowerPoints that it did not cap were not true, and that IBM often capped:

11

Q. Okay. Would you agree that under the commissions programs at IBM while you were there from the 2013 to 2015, that a software salesperson's earnings opportunity was uncapped?

A. No. I don't think any -- I don't think since I was there that their earnings were ever uncapped.

…

Q. And you see that each of these under the earnings opportunity block on the left side of the page, the third bullet point says, "Earnings opportunity remains uncapped"?

A. I do see that.

Q. And that's each of these four, on page 83, page 84, page 85, page 86, every single one of these says, "Earnings opportunity remains uncapped"; is that correct?

A. That's what I'm seeing, yeah.

Q. But that's not true from what you remember at IBM?

A. That's correct. I don't believe that's true.

(Exhibit F, pp. 43, 46-47.)

45.     The Choplin Depositions also make clear that, despite IBM's claim that it did not "cap" Mr. Choplin's commission when it reduced his commission payments, IBM employees used that exact term several times in emails when discussing the reduction in Mr. Choplin's commission payments. Similarly, as exhibited by Exhibits A and B, IBM, when referring to its reduction of Mr. Swafford's commission payments, also referred to what it was doing as "capping," "capped," "cap," or the like, including in emails sent during the period when IBM reduced Mr. Swafford's commission.

46.     Indeed, an email was produced in the Choplin case where Randolph Moorer specifically "recommend[ed] capping" the commissions of another sales representative, Mr. Stephenson, on both the LabCorp and BB&T Deals by approximately $600,000. (**Exhibit G**). As

PLAINTFF'S SECOND AMENDED COMPLAINT                    Case No. 5:18-cv-04916-LHK

1   shown in Exhibits A and B, there are other such emails where IBM discussed how it was

2   "capping" Mr. Swafford's commissions.

3          47.     IBM's Rule 30(b)(6) designee in the Choplin case testified that IBM is not

4   "capping" commissions, only "adjusting" them. (Exhibit C, p. 45). He further testified that "as

5   long as IBM's adjustments are to a specific deal and not all deals, IBM's position is that's not a

6   cap." (Exhibit C, p. 107).

7          48.     Contrary to Mr. Martinotti's testimony on behalf of IBM, other IBM employees,

8   including managers, executives, and sales representatives, are totally unaware of the distinction

9   that IBM attempts to make between a "cap" and an "adjustment" and almost exclusively refer to

10  what IBM does as "capping" or a "cap" on commissions. (Exhibit A, Exhibit B, Exhibit D, p. 43;

11  Exhibit E, p. 27; and Exhibit G). Indeed, as noted above, they use that exact word in their internal

12  emails.

13         49.     IBM claims that this usage of the word "cap" is a "mistake." (Exhibit C, p. 119).

14  On behalf of IBM, Mr. Martinotti testified that sales representatives, managers, and other

15  executives within IBM commonly use the term "capped" but shouldn't be using that term; they

16  should be using the term "adjusted" instead. Specifically, he testified:

17     Q:    Have you had anyone at IBM come to you after an adjustment and say, you know,
             "IBM capped me on this deal?"

18     A:    And I would go back to them and say that they didn't cap you; they adjusted you.

19     Q.    Okay. So, first, let me – that has happened?

20     A.    Yes.

21     Q.    Okay. So you would agree there is some confusion about the difference between a
             cap and an adjustment of commissions?

22     A.    The answer is yes, there is confusion or, said differently, they use the term
             interchangeably incorrectly.

23     Q.    Who is "they"?

A.      The sales representatives.

Q.      Okay, okay. You think – and managers too right?

A.      Right. **Every adjustment they consider to be a cap**, and that's no – you know, a cap is not an adjustment and adjustment is not a cap.

(Exhibit C, p. 108) (emphasis added).

50.      IBM also testified that executives such as Mr. Moorer (the executive actually responsible for determining whether and how much to cap Mr. Choplin's commissions on the BB&T Deal), are similarly mistaken when they use the term cap:

Q:      So Mr. Moorer here is using the word "cap" and "capping" isn't he?

A:      Correct. He is using the word "capping."

Q.      Okay. He is making that mistake that you would correct him on, right?

A.      Exactly.

Q.      But Mr. Moorer is the one – is one of the people who exercises judgment on those of how much or how little to pay in commissions, right?

A.      Yes.

(Exhibit C, pp. 119-120).

51.      Despite IBM's contention that its sales representatives, managers, and executives are all "confused" and "mistaken" when they refer to IBM's conduct as "capping" commissions, IBM makes no efforts to clarify the confusion in its 200 pages of Educational Materials. (Exhibit C, pp. 80-82). Indeed, none of the Educational Materials (where IBM repeatedly promises commissions are uncapped) contain any qualifiers or fine print of any kind.

52.      IBM does not clarify this confusion because it knows that if sales representatives knew that IBM might cap their commissions, it would demotivate the representatives and lead to lower sales for IBM. (Exhibit C, p. 158).

PLAINTFF'S SECOND AMENDED COMPLAINT                    Case No. 5:18-cv-04916-LHK

53.     IBM has even been told by its managers that it cannot continue to make representations like that in light of IBM's actual practices. One manager, Tom Batthany, wrote an email protesting IBM capping the commissions of a sales representatives he managed, where he says: "We can no longer have folks stand in the front of the room and say reps make $1 million and there are no caps." (**Exhibit H**).

54.     Mr. Swafford has met all conditions precedent to the bringing of this action.

### FIRST CLAIM FOR RELIEF
**(Violation of the California Unfair Competition Law)[2]**

55.     Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

56.     Defendant is a "person" as defined under California Business & Professions Code Section 17021.

57.     California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." IBM has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

58.     IBM's conduct, as described herein, was and is in violation of the UCL. IBM's conduct violates the UCL in at least the following ways:

    a.  by knowingly misrepresenting to Mr. Swafford the uncapped nature of his sales commissions;

---

[2] The Court has dismissed the unfair competition law claims based on the unlawful prong to the extent that the unlawful prong is predicated on violations of California Labor Code §§ 221 and 223, without leave to amend; Per *Lacey v. Maricopa Cty.*, 693 F.3d 896, 928 (9th Cir. 2012), Swafford has not realleged it in this amended pleading but intends to preserve this claim for appeal. The Court has also dismissed the unfair competition law claims based on the unlawful prong to the extent that the unlawful prong is predicated on violations of California Labor Code § 2751, with leave to amend; Swafford is amending that claim specifically to add allegations in support of a violation of California Labor Code § 2751 as a predicate for the unfair competition claim.

---

PLAINTFF'S SECOND AMENDED COMPLAINT                    Case No. 5:18-cv-04916-LHK

    b.  by willfully failing to pay all earned commissions wages to Mr. Swafford; and

    c.  by violating other California laws, including but not limited to, California Labor Code Sections 200, 201, 202, 204, and 2751 and the applicable Industrial Welfare Commission Wage Orders.

59.      Furthermore, any failure to pay wages is, by definition, an unfair business practice under Section 17200.

60.      IBM's misrepresentations alleged herein caused Plaintiff to sell as many of IBM's products and services as he could, often at the expense of quality time with his family that he would not otherwise have sacrificed had he known that IBM would not pay him the commissions he earned.

61.      Accordingly, Plaintiff has suffered injury in fact including lost money as a result of Defendants' misrepresentations.

62.      IBM should be made to disgorge these ill-gotten gains and to restore to Mr. Swafford the wrongfully withheld wages to which he is entitled, as well as interest on these wages.

63.      As alleged above, Labor Code Section 2751 states, in pertinent part: "Whenever an employer enters into a contract of employment with an employee for services to be rendered within this state and the contemplated method of payment of the employee involves commissions, the contract shall be in writing and set forth the method by which the commissions shall be paid." The statute also provides that an employer must give a "signed" copy of the contract to the employee and obtain a receipt for the contract from the employee.

64.      As alleged above, IBM violated section 2751 because the IPL undisputedly is not a contract, and therefore it is not sufficient under section 2751, and there is no other document that is a written contract sufficient under section 2751.  Furthermore, IBM violated section 2751

because IBM did not sign any sufficient contract (and it did not sign the IPL), nor did IBM obtain a receipt from Swafford for his receipt of any written contract.

65.     A violation of section 2751, even if it cannot support a standalone claim, can serve as a predicate violation for a claim under the UCL.  Plaintiff alleges a claim against IBM for violation of the UCL for its unlawful conduct in violating the provision of section 2751, as outlined above.

66.     Plaintiff seeks to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendant under Cal. Bus. & Prof. Code § 17200 *et seq.*

67.     Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin IBM from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiff any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code §17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below, including, but not limited to Plaintiff's attorneys' fees.

**SECOND CLAIM FOR RELIEF**
**(Fraudulent Misrepresentation)**[3]

68.     Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

69.     IBM, through its agents, represented to Mr. Swafford that his commissions would not be capped, in at least the following instances: (1) the PowerPoints, which, IBM sent to Mr. Swafford to explain his commissions for the 2H 2016 sales period, and which Mr. Swafford

---

[3] The Court has dismissed the fraud claim to the extent that it relies on oral representations, with leave to amend; Swafford has amended this claim and included additional allegations in support.

reviewed, and which were always available via the intranet[4]; and (2) the statements by IBM executives and Managers that commissions would not be capped were made directly to Mr. Swafford at the beginning of each sales period, including the beginning of 2H 2016, when they discussed commissions and compensation for that period.

70.     More specifically, IBM managers Mark Briggs and Richard Wirtenson told Mr. Swafford during the 2H 2016 sales period that his commissions at IBM were uncapped.

71.     IBM's representations to Mr. Swafford that commissions would not be capped were statements of IBM's commissions policy. When IBM executives, managers, and other employees told Mr. Swafford that his commissions would not be capped, they simply repeated what IBM had told them was IBM's official policy, which is set forth in the PowerPoints and on training materials that IBM uses to instruct managers how they should explain IBM's commissions policy to IBM sales employees like Mr. Swafford. IBM represented that Mr. Swafford's commissions would not be capped in virtually all IBM documents that explained how his commissions would be paid.

72.     Those representations were false.

73.     Those representations were false when made and IBM, through its agents, knew that they were false when made. IBM intended to deceive Mr. Swafford in making those misrepresentations. Simply put, IBM knew that Mr. Swafford's commissions might be and would be capped, even though it told him in all of these instances that they would not be capped.

74.     Indeed, Exhibits A and B indicate that both of Mr. Swafford's managers understood what IBM did to him to constitute a cap on his earnings.

---

[4] The PowerPoints were created by, and with the guidance and input of, IBM managers at the highest levels of management and represents a binding representation by IBM about commissions.

PLAINTFF'S SECOND AMENDED COMPLAINT                    Case No. 5:18-cv-04916-LHK

75.     Mr. Swafford reasonably and justifiably relied on the representations of IBM. Notably, the representations were made after Mr. Swafford signed the IPL, including those in the PowerPoints, and those by IBM managers Mark Briggs and Richard Wirtenson. Mr. Swafford reasonably and justifiably relied on the representations by, among other things, continuing to work hard and sell as much software and services as possible for the benefit of IBM. Had Mr. Swafford known that he would not be paid what he was promised and what he expected, he would have worked differently at IBM, in commensuration with his actual compensation, and/or he would have sought another job that paid him what his efforts were worth and/or did not cap commissions. Had Mr. Swafford known that he would be capped as he was, he would have worked his deals differently at IBM so as to maximize his compensation.

76.     The reasonableness of Mr. Swafford's reliance is supported by, among other things, the fact that Mr. Swafford's managers Mark Briggs and Richard Wirtenson also believed that his commissions were uncapped, the admissions in the Choplin case by IBM, Mr. Choplin's two managers, and former IBM executive Mark Dorsey. Each of these individuals, and IBM itself, admitted that it was reasonable for a sales representative to rely on IBM's representations that commissions were uncapped. Moreover, Mr. Choplin also testified that he relied on the same promises of uncapped commissions as Mr. Swafford, which further supports the reasonableness of Mr. Swafford's reliance.

77.     Mr. Swafford was damaged by IBM's fraudulent statements in an amount exceeding $75,000.

78.     Furthermore, IBM fraudulently concealed from Mr. Swafford that it would and did cap commissions, the fact that it had internal budgets for commissions, and all aspects of its practice of capping commissions. IBM had a duty to speak because (a) it chose to speak by telling Mr. Swafford and others that they would not be capped, thereby taking on a duty to make a full

19

and fair disclosure of facts concerning the matters on which IBM chose to speak; and (b) it took affirmative steps to conceal material facts from Mr. Swafford. IBM failed to fulfill the duty to speak and make a full and fair disclosure of the facts. IBM concealed the facts with the intent to deceive Mr. Swafford, who was in fact deceived. Mr. Swafford justifiable relied on IBM's silence about those facts, and he was injured as a result of IBM's fraudulent concealment in an amount exceeding $75,000.

### THIRD CLAIM FOR RELIEF
**(Alternative Claim - Negligent Misrepresentation)[5]**

79.     Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

80.     Mr. Swafford alleges this claim in the alternative to the claim for fraudulent misrepresentation.

81.     IBM, through its agents, represented to Mr. Swafford that his commissions would not be capped, in at least the following instances: (1) the PowerPoints, which, IBM sent to Mr. Swafford to explain his commissions for the 2H 2016 sales period, and which Mr. Swafford reviewed, and which were always available via the intranet[6]; and (2) the statements by IBM executives and Managers  that commissions would not be capped were made directly to Mr. Swafford at the beginning of each sales period, including the beginning of 2H 2016, when they discussed commissions and compensation for that period.

---

[5] The Court has dismissed the negligent misrepresentation claim to the extent that it relies on oral representations, with leave to amend; Swafford has amended this claim and included additional allegations in support.

[6] The PowerPoints were created by, and with the guidance and input of, IBM managers at the highest levels of management and represents a binding representation by IBM about commissions.

PLAINTFF'S SECOND AMENDED COMPLAINT                    Case No. 5:18-cv-04916-LHK

82.     More specifically, IBM managers Mark Briggs and Richard Wirtenson told Mr. Swafford during the 2H 2016 sales period that his commissions at IBM were uncapped.

83.     IBM's representations to Mr. Swafford that commissions would not be capped were statements of IBM's commissions policy. When IBM executives, managers, and other employees told Mr. Swafford that his commissions would not be capped, they simply repeated what IBM had told them was IBM's official policy, which is set forth in the PowerPoints and on training materials that IBM uses to instruct managers how they should explain IBM's commissions policy to IBM sales employees like Mr. Swafford. IBM represented that Mr. Swafford's commissions would not be capped in virtually all IBM documents that explained how his commissions would be paid. IBM's agents made the representation negligently, without exercising the care that a reasonable person would exercise in the circumstances. IBM made the representations with the knowledge and intention that Mr. Swafford rely on the statements, and he reasonably and justifiably relied on the representations of IBM.

84.     Notably, some or all of the representations were made after Mr. Swafford signed the IPL, including those in the PowerPoint, and those by IBM manager Mark Briggs and Richard Wirtenson. Mr. Swafford reasonably and justifiably relied on the representations by, among other things, continuing to work hard and sell as much software and services as possible for the benefit of IBM.

85.     The reasonableness of Mr. Swafford's reliance is supported by, among other things, the fact that Mr. Swafford's managers Mark Briggs and Richard Wirtenson also believed that his commissions were uncapped, the admissions in the Choplin case by IBM, Mr. Choplin's two managers, and former IBM executive Mark Dorsey. Each of those individuals, and IBM itself, admitted that it was reasonable for a sales representative to rely on IBM's representations that commissions were uncapped. Moreover, Mr. Choplin also testified that he relied on the same

PLAINTFF'S SECOND AMENDED COMPLAINT                    Case No. 5:18-cv-04916-LHK

promises of uncapped commissions as Mr. Swafford, which further supports the reasonableness of Mr. Swafford's reliance.

86.      Had Mr. Swafford known that he would not be paid what he was promised and what he expected, he would have worked differently at IBM, in commensuration with his actual compensation, and/or he would have sought another job that paid him what his efforts were worth and/or did not cap commissions. Had Mr. Swafford known that he would be capped as he was, he would have worked his deals differently at IBM so as to maximize his compensation.

87.      Indeed, Exhibits A and B indicate that both of Mr. Swafford's managers understood what IBM did to him to constitute a cap on his earnings.

88.      IBM owed Mr. Swafford a duty of care in making the representations.

89.      Mr. Swafford reasonably and justifiably relied on the representations of IBM.

90.      Mr. Swafford was damaged by IBM's negligent misrepresentations.

91.      Mr. Swafford has been damaged by IBM's negligence in an amount exceeding $75,000.00.

**FOURTH CLAIM FOR RELIEF**
**(Alternative Claim – Quantum Meruit)**

92.      Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

93.      Mr. Swafford rendered valuable consideration to IBM, in the form of work performed to close all of the deals, for which he has not been paid. The consideration has a reasonable value of *at least* $249,765, although the exact amount is for the jury.

94.      At the time that Mr. Swafford performed the work, he reasonably expected to be paid by IBM.  IBM received and benefited from the work with knowledge or reason to know that Mr. Swafford expected to be paid. IBM voluntarily accepted the benefit of the work and kept the benefits therefrom without waiving, refusing, or returning the benefit.

22

95.      Mr. Swafford is entitled under the doctrine of quantum meruit to recover damages from IBM in the amount of *at least* $75,000.

## FIFTH CLAIM FOR RELIEF
### (Unjust Enrichment)

96.      Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

97.      At the specific request of IBM and for its use and benefit, Mr. Swafford has performed work for IBM in the form of making sales of its software and services.

98.      The value of the work performed for IBM by Mr. Swafford for which he has not been paid is *at least* $249,765, although the exact amount is for the jury.

99.      During and since the performance of the work by Mr. Swafford, IBM has failed to pay him and there is due and owing to Mr. Swafford from IBM, a principal sum amount of *at least* $249,765.

100.      Despite Mr. Swafford being owed in excess of another $249,765, IBM has failed and refused to pay the same or any part of it.

101.      As a result of IBM's refusal to pay Mr. Swafford the above-stated sum due and owing to him, IBM has become unjustly enriched in the amount of *at least* $75,000.

## SIXTH CLAIM FOR RELIEF
### (Punitive Damages)

102.      Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

103.      The actions and conduct of IBM, as set forth herein, entitle Mr. Swafford to compensatory damages, and are accompanied by aggravating factors which caused and relate to Mr. Swafford's injuries which give rise to his claim for compensatory damages.

104.      This conduct, as set forth herein, includes, among other things, fraud.

105.     IBM facilitated the conduct constituting fraud and the willful, wanton, and outrageous conduct giving rise to punitive damages, as set forth herein and otherwise.

## SEVENTH CLAIM FOR RELIEF
### (Violation of California Civil Code § 1668)

106.     The Court has dismissed this claim, without leave to amend. Per *Lacey v. Maricopa Cty.,* 693 F.3d 896, 928 (9th Cir. 2012), Swafford has not realleged it in this amended pleading but intends to preserve this claim for appeal.

## EIGHTH CLAIM FOR RELIEF
### (Violation of California Labor Code § 221)

107.     The Court has dismissed this claim, without leave to amend. Per *Lacey v. Maricopa Cty.,* 693 F.3d 896, 928 (9th Cir. 2012), Swafford has not realleged it in this amended pleading but intends to preserve this claim for appeal.

## NINTH CLAIM FOR RELIEF
### (Violation of California Labor Code § 223)

108.     The Court has dismissed this claim, without leave to amend. Per *Lacey v. Maricopa Cty.,* 693 F.3d 896, 928 (9th Cir. 2012), Swafford has not realleged it in this amended pleading but intends to preserve this claim for appeal.

## TENTH CLAIM FOR RELIEF
### (Violation of California Labor Code § 2751)

109.     The Court has dismissed this claim, without leave to amend. Per *Lacey v. Maricopa Cty.,* 693 F.3d 896, 928 (9th Cir. 2012), Swafford has not realleged it in this amended pleading but intends to preserve this claim for appeal.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Swafford prays the Court for the following relief:

1.      That Mr. Swafford have and recover from IBM for violations of the California Labor Code in the amount exceeding $75,000, plus interest, costs, and attorneys' fees as allowed by law;

2.      That Mr. Swafford have and recover from IBM for violations of the California Unfair Competition Law injunctive relief authorized by Business and Professions Code Sections 17202 and 17203 and restitution of his improperly withheld commissions, including interest, costs, and attorneys' fees as allowed by law;

3.      Mr. Swafford have and recover from IBM for fraudulent misrepresentation in the amount exceeding $75,000, and interest and costs as allowed by law;

4.      Mr. Swafford have and recover from IBM for negligent misrepresentation in the amount exceeding $75,000, and interest and costs as allowed by law;

5.      Mr. Swafford have and recover from IBM for *quantum meruit* or unjust enrichment in an amount to be determined at trial, plus interest on the judgment until paid in full at the legal rate as allowed by law;

6.      That Mr. Swafford be awarded punitive damages;

7.      That all costs of this action be taxed against IBM; and

8.      That the Court award Mr. Swafford such other and further relief as this Court may deem just and proper.

### JURY DEMAND

PLAINTIFF DEMANDS A TRIAL BY JURY.

Respectfully submitted this 16th day of May, 2019.

/s/ Matthew E. Lee
Matthew E. Lee (*pro hac vice*)
Jeremy R. Williams (*pro hac vice*)
**WHITFIELD BRYSON & MASON, LLP**
900 W. Morgan Street

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Raleigh, NC 27603
Telephone: (919) 600-5000
Facsimile: (919) 600-5035
matt@wbmllp.com
jeremy@wbmllp.com

Mark R. Sigmon (*pro hac vice*)
SIGMON LAW, PLLC
5 West Hargett Street, Suite 1001
Raleigh, North Carolina 27601
Telephone: (919) 451-6311
Facsimile: (919) 882-9057
mark@sigmonlawfirm.com

Crystal Foley (SBN 224627)
**Simmons Hanly Conroy LLC**
100 N. Pacific Coast Highway
Suite 1350
El Segundo, CA 90245
Telephone: (310) 322-3555
Facsimile: (310) 322-3655
cfoley@simmonsfirm.com

*Attorneys for Plaintiff*

PLAINTFF'S SECOND AMENDED COMPLAINT                    Case No. 5:18-cv-04916-LHK

1

UNITED STATES DISTRICT COURT

2

NORTHERN DISTRICT OF CALIFORNIA

3

Case Number: 5:18-cv-4916

4

DAVID SWAFFORD,                                  )
                                                 )
5

                    Plaintiff,                   )
                                                 )
6

vs.                                              )          **<u>CERTIFICATE OF SERVICE</u>**
                                                 )
7

INTERNATIONAL BUSINESS                           )
8

MACHINES CORPORATION,                            )
                                                 )
9

                    Defendant.                   )

10

11      This is to certify that on May 16, 2019, I electronically filed the foregoing **SECOND AMENDED COMPLAINT** with the Clerk of Court using the Court's CM/ECF electronic service system, which will send notification of such filing to parties of record.

12

13

                    BY:     <u>*/s/ Matthew E. Lee*</u>
14

                            MATTHEW E. LEE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTFF'S SECOND AMENDED COMPLAINT                    Case No. 5:18-cv-04916-LHK