1
2
3
4
5
6

Tyler A. Brown (State Bar No. 121350)
Justin R. Barnes (*pro hac vice*)
Donald P. Sullivan (State Bar No. 191080)
JACKSON LEWIS P.C.
50 California Street, 9th Floor
San Francisco, California  94111-4615
Telephone:  (415) 394-9400
Facsimile:  (415) 394-9401
E-mail:  Tyler.Brown@jacksonlewis.com
        Justin.Barnes@jacksonlewis.com
        Donald.Sullivan@jacksonlewis.com

7
8

Attorneys for Defendant
INTERNATIONAL BUSINESS MACHINES
CORPORATION

9
10
11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

12
13
14
15
16
17
18
19
20

| | |
|---|---|
| DAVID SWAFFORD,<br><br>Plaintiff,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Defendant. | Case No. 5:18-cv-04916-LHK<br><br>**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing Date:   September 19, 2019<br>Time:           1:30pm<br>Ctrm.:          8, 4th Fl.<br>Judge:          Hon. Lucy H. Koh<br><br>Am. Complaint Filed: May 16, 2019<br>Trial Date:           December 13, 2019 |

21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION AND SUMMARY OF ARGUMENTS ................................................2

II.   STATEMENT OF ISSUES ...........................................................................................4

III.  FACTS ............................................................................................................................4

      A.   Plaintiff's Employment with IBM ..............................................................4

      B.   Plaintiff's Incentive Plan Letter ................................................................5

      C.   The Disclaimers Contained in Plaintiff's IPLs ........................................5

      D.   Alleged Representations Made by IBM......................................................7

      E.   The Oracle Transaction ..............................................................................8

      F.   The Sabre Transaction................................................................................9

      G.   Plaintiff Knew IBM Could Review His Commissions ...............................9

      H.   The Oracle and Sabre Transactions Triggered an "Account Level
           Inspection" of Plaintiff's Commissions ....................................................9

      I.   Other Deals Closed in the Second Half of 2016 ......................................11

IV.   ARGUMENT AND CITATION TO AUTHORITY ......................................................11

      A.   Legal Standard. ........................................................................................11

      B.   Numerous Courts Have Rejected Similar Claims Based Upon the Plain
           Terms of the IPL ......................................................................................12

      C.   Plaintiff's Fraud Claim Fails....................................................................15

           i.    Plaintiff cannot show that IBM made false statements. .............15

           ii.   Plaintiff cannot show that IBM intended to deceive him. ..........16

           iii.  Plaintiff cannot show he reasonably relied on any alleged false
                 statements. .................................................................................17

      D.   Plaintiff's Negligent Misrepresentation Claim Fails...............................19

      E.   Plaintiff's Quantum Meruit and Unjust Enrichment Claims Fail. ..........19

      F.   Plaintiff's Unfair Competition Claim Fails...............................................21

           i.    Unfair and Fraudulent Prongs. ..................................................21

           ii.   Unlawful Prong........................................................................22

G.      The Court Should Dismiss Plaintiff's Claim for Punitive Damages. ....................23

V.      CONCLUSION .............................................................................................................24

Defendant's Motion for Summary Judgment                              Case No.: 5:18-cv-04916-LHK

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**<u>California Cases</u>**

*Huskinson & Brown v. Wolf,*
   32 Cal. 4th 453 (2004) ............................................................................................20

*Koehl v. Verio, Inc.,*
   142 Cal. App. 4th 1313, 1330 (2006) ....................................................................13

*Lazar v. Hertz Corp.,*
   69 Cal. App. 4th 1494 (1999)................................................................................22

**<u>Federal Cases</u>**

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986)...............................................................................................11

*Beard v. IBM,*
   No. C 18-06783 WHA, 2019 U.S. Dist. LEXIS 60302 (N.D. Cal. Apr. 7, 2019)...................14

*Fessler v. IBM,*
   2018 U.S. Dist. LEXIS 202725 (E.D. Va. Nov. 28, 2018) ..........................................18, 19, 21

*FTC v. Stefanchik,*
   559 F.3d 924 (9th Cir. 2009).............................................................................12, 23

*Gabana Gulf Distrib., Ltd. v. Gap Int'l Sales, Inc.,*
   No C 06-02584 CRB, 2008 U.S. Dist. LEXIS 1658 (N.D. Cal. Jan. 9, 2008) ........................15

*Gilmour v. IBM,*
   No. CV 09-04155, 2009 U.S. Dist. LEXIS 127142 (C.D. Cal. Dec. 16, 2009)..................13, 14

*Glen K. Jackson, Inc. v. Roe,*
   273 F.3d 1192 (9th Cir. 2001)...............................................................................19

*Hofmann v. Exxon Corp.,*
   No. C-93-0392, 1994 U.S. Dist. LEXIS 3518 (N.D. Cal. Mar. 18, 1994)..............................20

*In re De Laurentis Ent. Grp. Inc.,*
   963 F.2d 1269 (9th Cir. 1992)...............................................................................20

*Jensen v. IBM,*
   454 F.3d 382 (4th Cir. 2006).............................................................................16, 17

*Kemp v. IBM,*
   No. 3:09-cv-03683, 2010 U.S. Dist. LEXIS 118801(N.D. Cal. Nov. 4, 2010) ..................12, 13

iii

*Kenney v. Deloitte, Haskins & Sells,*
  No. C 91-0590 BAC, 1992 U.S. Dist. LEXIS 14600 (N.D. Cal. Sept. 1, 1992) .....................17

*Middleton v. IBM,*
  2019 U.S. Dist. LEXIS 61308 (N.D. Ga. Jan. 2, 2019) ................................................19, 20, 21

*Morris v. IBM,*
  2018 U.S. Dist. LEXIS 222568 (W.D. Tex. Nov. 29, 2018) ...................................................20

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*
  210 F.3d 1099 (9th Cir. 2000)..........................................................................................11, 12

*Pero v. IBM,*
  No. 12-CV-07484 (KM), 2014 U.S. Dist. LEXIS 2461 (D.N.J. Jan. 2, 2014) .......................21

*Pfeister v. IBM,*
  No. 17-cv-03573-DMR, 2017 U.S. Dist. LEXIS 170970 (N.D. Cal. Oct. 16,
  2017) .....................................................................................................................................12, 13

*Schwarzkopf v. IBM,*
  No. C 08-2715, 2010 U.S. Dist. LEXIS 46813 (N.D. Cal. May 12, 2010) ..................... *passim*

*Snyder v. IBM,*
  2019 U.S. Dist. LEXIS 66583 (N.D. Ga. Mar. 18, 2019)........................................................20

*Soremekun v. Thrifty Payless, Inc.*
  509 F.3d 978 (9th Cir. 2007).......................................................................................................11

*Stearns v. Select Comfort Retail Corp.,*
  No. 08-2746 JF, 2009 U.S. Dist. LEXIS 48367 (N.D. Cal. June 5, 2009) ..............................19

*Summit Estate, Inc. v. Cigna Healthcare of Cal., Inc.,*
  No. 17-CV-03871-LHK, 2017 U.S. Dist. LEXIS 167462 (N.D. Cal. Oct. 10,
  2017) ......................................................................................................................................20

*Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*
  322 F.3d 1039 (9th Cir. 2003)......................................................................................................11

*Vinson v. IBM,*
  2018 U.S. Dist. LEXIS 164042 (Sept. 25, 2018).....................................................................16

*Von Grabe v. Spring PCS,*
  312 F. Supp. 2d 1285 (S.D. Cal. 2003).....................................................................................23

**California Statutes**

California Business and Professions Code
  § 17200...................................................................................................................................21, 22

California Civil Code
    § 3294.............................................................................................................................23

California Labor Code.............................................................................................. *passim*

California Labor Code
    § 200............................................................................................................................22
    § 201............................................................................................................................22
    § 202............................................................................................................................22
    § 204............................................................................................................................22
    § 2751....................................................................................................................22, 23

**<u>Other Authorities</u>**

Federal Rules of Civil Procedure, Rule 56(a) ................................................................11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendant's Motion for Summary Judgment                    Case No.: 5:18-cv-04916-LHK

1
<u>**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**</u>

2
**TO THE HONORABLE COURT, PLAINTIFF, AND HIS ATTORNEYS OF RECORD:**

3
**PLEASE TAKE NOTICE THAT** on September 19, 2019, at 1:30 p.m. in Courtroom 8 of

4
the above-entitled Court, located at the San Jose Courthouse, 280 South 1st Street, San Jose,

5
California, 95113, before the Honorable Lucy H. Koh, Defendant INTERNATIONAL BUSINESS

6
MACHINES CORPORATION ("IBM" or "Defendant"), will move the Court for an order granting

7
summary judgment against Plaintiff DAVID SWAFFORD ("Plaintiff") as to Plaintiff's Second

8
Amended Complaint in its entirety.

9
This motion is made pursuant to Federal Rules of Civil Procedure, Rule 56, and is based on

10
the grounds that no genuine fact issues exist and that Defendant is entitled to prevail on the claims

11
set forth in Plaintiff's Second Amended Complaint as a matter of law.  This motion is based on this

12
Notice of Motion and Motion for Summary Judgment and Memorandum of Points and Authorities

13
and concurrently filed supporting declaration of Justin R. Barnes, along with supporting evidence

14
attached thereto, the pleadings on file with this Court, including the Second Amended Complaint,

15
oral argument of counsel, and any other matter which this Court may properly consider.

16
Dated:  July 25, 2019                          JACKSON LEWIS P.C.

17

18
By:      /s/ *Justin R. Barnes*
                Tyler A. Brown

19
                Justin R. Barnes (*pro hac vice*)
                Donald P. Sullivan

20
                Attorneys for Defendant
                INTERNATIONAL BUSINESS

21
                MACHINES CORPORATION

22

23

24

25

26

27

28

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.   INTRODUCTION AND SUMMARY OF ARGUMENTS**

3        On August 14, 2018, Plaintiff – a software sales representative for IBM – sued IBM alleging

4   that IBM owes him purportedly unpaid commissions related to deals IBM entered into with Oracle

5   and Sabre, Inc., in 2016.  Plaintiff initially asserted claims for (1) breach of oral and/or implied

6   contract; (2) quantum meruit; (3) unjust enrichment; (4) fraudulent misrepresentation; (5) negligent

7   misrepresentation; (6) violation of the California Labor Code; (7) violation of the California Unfair

8   Competition Law; and (8) punitive damages.   On October 19, 2018, IBM moved to dismiss

9   Plaintiff's Complaint.  *See* ECF No. 24.  In response to IBM's Motion to Dismiss, Plaintiff filed an

10   Amended Complaint on November 2, 2018.  *See* ECF No. 37.  In his Amended Complaint, Plaintiff

11   asserted claims for: (1) violation of the California Labor Code; (2) violation of the California Unfair

12   Competition Law; (3) fraudulent misrepresentation; (4) negligent misrepresentation; (5) quantum

13   meruit; (6) unjust enrichment; and (7) punitive damages.  On November 16, 2018, IBM moved to

14   dismiss Plaintiff's Amended Complaint.  *See* ECF No. 42.  On April 17, 2019, the Court granted

15   in part and denied in part IBM's Motion to Dismiss Plaintiff's Amended Complaint.  *See* ECF No.

16   69.  On May 16, 2019, Plaintiff filed a Second Amended Complaint.  *See* ECF No. 71.  Plaintiff

17   now brings claims for (1) violation of the California Unfair Competition Law; (2) fraudulent

18   misrepresentation; (3) negligent misrepresentation; (4) quantum meruit; (5) unjust enrichment; and

19   (6) punitive damages.  Now that the parties have completed discovery, the undisputed facts in the

20   record demonstrate that the claims in Plaintiff's Second Amended Complaint fail as a matter of

21   law.

22        <u>Plaintiff's Fraud Claim</u>

23        Plaintiff contends IBM made fraudulent misrepresentations to him regarding his

24   commissions when it stated in a PowerPoint presentation that his "payments" and "earnings

25   opportunity" remained uncapped.  Plaintiff's fraud claim fails.  First and foremost, the statements

26   in the PowerPoint were not false; they were consistent with the plain terms of Plaintiff's Incentive

27   Plan Letter – or IPL – and the way IBM handled Plaintiff's commissions on the deals in question.

28   Moreover, IBM was upfront with Plaintiff about its commission policies and practices, and the

1   plain language of the IPL shows that IBM reserved the discretion to review and adjust commission
2   payments, thereby foreclosing Plaintiff's argument that IBM made false representations with an
3   intent to deceive him.   Furthermore, any purported reliance by Plaintiff on any alleged
4   misinformation about his commissions was not reasonable in light of the unambiguous disclaimers
5   contained in the IPL, which Plaintiff admittedly read and was familiar with and which expressly
6   gave IBM the right to do what it did in this case.  Indeed, Plaintiff himself testified that he was even
7   expecting his commissions on the Sabre and Oracle deals to get reviewed by IBM management.
8   Accordingly, no triable issues of fact remain regarding whether IBM made fraudulent
9   misrepresentations to him about his commissions.

10          Plaintiff's Negligent Misrepresentation Claim

11          Plaintiff relies on the same PowerPoint to contend that IBM made negligent
12   misrepresentations to him concerning his commissions.  For the same reasons that his fraud claim
13   fails, the unambiguous language in his IPL forecloses Plaintiff's ability to establish the requisite
14   justifiable reliance on any allegedly negligent misrepresentations to sustain this claim.

15          Plaintiff's Quantum Meruit and Unjust Enrichment Claims

16          Plaintiff also asserts claims for quantum meruit and unjust enrichment, arguing that the
17   more than $700,000 he was paid in commissions and the more than $70,000 he was paid in salary
18   for the second half of 2016 did not adequately compensate him for the duties he performed during
19   that period.[1]  These claims also fail.  In light of the unambiguous disclaimers in his IPL, Plaintiff
20   cannot demonstrate that IBM's adjustment of his commission payments was unjust or that he had
21   a reasonable expectation of additional payments.  His IPL expressly informed him that commissions
22   were not earned until review of commissions was complete and that IBM reserved the right to
23   review and adjust his commissions on significant transactions.  Moreover, IBM did not adjust or
24   limit Plaintiff's overall earning ability.  Rather, IBM did exactly what it had the right to do under
25   the terms of Plaintiff's incentive plan: review and adjust his commissions on significant
26   transactions.   This obviates any contention that IBM's failure to pay Plaintiff additional

27
28   [1] Plaintiff's annual base salary in 2016 was $142,444.76. Declaration of Justin R. Barnes ("Barnes Decl."), Ex. A (Pl. Dep. 48:8-11).

3

commissions was "unjust" or that Plaintiff could have reasonably expected additional compensation.

### Plaintiff's California Unfair Competition Claim

For many of the same reasons as explained above, Plaintiff is unable to show the existence of an underlying unlawful, unfair, or fraudulent act by IBM.  Thus, Plaintiff's unfair competition claim also fails.

### Punitive Damages

Plaintiff's claim for punitive damages is derivative of his fraud claim.  Because his fraud claim fails, Plaintiff's punitive damages claim also fails.

## II.   STATEMENT OF ISSUES

1.     Whether Plaintiff's fraudulent misrepresentation claim fails because he cannot show that IBM made false statements, that IBM intended to deceive him, or that he justifiably relied on any alleged false statements.

2.     Whether Plaintiff's negligent misrepresentation claim fails because he cannot show a misrepresentation or that he justifiably relied on any alleged misrepresentation.

3.     Whether Plaintiff's unjust enrichment and quantum meruit claims fail because Plaintiff cannot show that he reasonably expected compensation beyond what he was paid or that IBM was unjustly enriched.

4.     Whether Plaintiff's Unfair Competition Claim fails because he cannot show an underlying unlawful, unfair, or fraudulent act.

5.     Whether Plaintiff's punitive damages claim fails because he cannot prove his underlying misrepresentation claims.

## III.   FACTS

### A.   **Plaintiff's Employment with IBM**

Plaintiff began his employment with IBM on or about February 1, 2009.  Barnes Decl., Ex. A (Pl. Dep. 36:4-7).  From 2009 through 2016, Plaintiff sold software to customers who then embedded the software into their own software.  *Id.*, Ex. A (Pl. Dep. 36:25-37:17, 40:19-24).  Mark Briggs was Plaintiff's first line manager in 2016.  *Id.*, Ex. A (Pl. Dep. 41:22-24); Ex. B (Briggs

4

1    Dep. 28:7-15).  Rich Wirtenson was Plaintiff's second line manager in 2016.  *Id.*, Ex. A (Pl. Dep.

2    41:25-42:3); Ex. C (Wirtenson Dep. 17:20-18:2).   IBM paid Plaintiff a base salary plus

3    commissions: in 2016 IBM paid Plaintiff a base salary of $142,000 and over $700,000 in

4    commissions just for the second half of the year.  *Id.*, Ex. A (Pl. Dep. 48:8-11, 151:11-17).  The

5    year prior, IBM paid Plaintiff a base salary of $142,000 and commissions in the amount of

6    approximately $969,000.  *Id.*, Ex. A (Pl. Dep. 46:8-23).  Plaintiff still sells software at IBM.  *Id.*,

7    Ex. A (Pl. Dep. 23:2-18).

8                    **B.      Plaintiff's Incentive Plan Letter**

9            Throughout his employment with IBM, Plaintiff received Incentive Plan Letters ("IPL"),

10   and each letter covered a six-month sales period.  *Id.*, Ex. A (Pl. Dep. 50:4-6, 60:25-66:18).  The

11   IPL set Plaintiff's quota for each sales period.  *Id.*, Ex. A (Pl. Dep. 67:4-11).  Plaintiff accepted his

12   IPL for the second half of 2016 on July 12, 2016, which covered the selling period beginning July

13   1, 2016 through December 31, 2016.  *Id.*, Ex. A (Pl. Dep. 66:24-67:8, Ex. 4).  Plaintiff's sales quota

14   for software sales for the second half of 2016 was $512,600.  *Id.*, Ex. A (Pl. Dep. 67:9-11).

15                   **C.      The Disclaimers Contained in Plaintiff's IPLs**

16           Without an IPL in place, Plaintiff was not eligible for incentive payments.  *Id.*, Ex. A (Pl.

17   Dep. 30:20-21, Ex. 4).  Plaintiff's IPL for the second half of 2016 stated that, when Plaintiff

18   accepted the terms of his IPL, he became "registered in FMS as an on-plan eligible employee in

19   the IBM job role assigned to [Plaintiff] by [his] manager...By doing so, [Plaintiff] also

20   acknowledge[d] that [he] read and understood the contents of this letter and the official Plan terms

21   accessible to [him] at the website above."  *Id.*, Ex. A (Pl. Dep. Ex. 4 at 2).

22           Plaintiff's IPL for the second half of 2016 contained an "Other Important Information"

23   section, which Plaintiff admits he had previously read.  *Id.*, Ex. A (Pl. Dep. 67:12-20.)  That section

24   contained several disclaimers about Plaintiff's IPL; the disclaimers contained in the "Other

25   Important Information" sections of Plaintiff's IPLs from 2013-2016 are similar.  *Id.*, Ex. A (Pl.

26   Dep. 67:12-20.)  Several of the disclaimers in the "Other Important Information" section are of

27   particular relevance here.

28           Plaintiff's IPL for the second half of 2016 contained the following "Right to Modify or

5

Cancel" clause:

> **Right to Modify or Cancel:**  The Plan does not constitute an express or implied contract or a promise by IBM to make any distributions under it.  IBM reserves the right to adjust the Plan terms, including, but not limited to, changes to sales performance objectives (including management-assessment objectives), changes to assigned customers, territories, or account opportunities, or changes to applicable incentive payment rates or quotas, target incentives or similar earnings opportunities, or to modify or cancel the Plan, for any individual or group of individuals, at any time during the Plan period up until any related payments have been earned under the Plan terms. Managers below the highest levels of management do not know whether IBM will or will not change or adopt any particular compensation plan; they do not have the ability to change the Plan terms for any employee; nor are they in a position to advise any employee on, or speculate about, future plans. Employees should make no assumptions about the impact potential Plan changes may have on their personal situations unless and until any such changes are formally announced by IBM.

*Id.*, Ex. A (Pl. Dep. 68:24-69:3, Ex. 4 at 3).  Prior to the dispute giving rise to this lawsuit, Plaintiff never discussed the meaning of the "Right to Modify or Cancel" provision with anyone.  *Id.*, Ex. A (Pl. Dep. 69:1-7).

Plaintiff's IPL for the second half of 2016 also contained a "Significant Transactions" clause, which provided:

> **Significant Transactions:** IBM reserves the right to review and, in its sole discretion, adjust incentive achievement and/or related payments associated with a transaction which (1) is disproportionate when compared with the territory opportunity anticipated during account planning and used for the setting of any sales objectives; or for which (2) the incentive payments are disproportionate when compared with your performance contribution towards the transaction.

*Id.*, Ex. A (Pl. Dep. 69:8-10, 93:7-94:4, Ex. 4 at 4).  The "Significant Transactions" provision states that IBM has the right to adjust incentive and/or related payments.  *Id.*, Ex. A (Pl. Dep. 94:5-25). This provision is applicable where a large deal closes that was not anticipated during quota setting. *Id.*, Ex. D (Martinotti Dep. 94:2-5).  Prior to the dispute giving rise to this lawsuit, Plaintiff never discussed the meaning of the "Significant Transactions" provision with anyone.  *Id.*, Ex. A (Pl. Dep. 69:8-18).

Plaintiff's IPL for the second half of 2016 included an "Adjustments for Errors" clause, which stated:

> **Adjustment for Errors:** IBM reserves the right to review and, in its sole discretion, adjust or require repayment of incorrect incentive payments resulting from

1

2

3

> incomplete incentives processes or other errors in the measurement of achievement
> or the calculation of payments, including errors in the creation or communication of
> sales objectives.  Depending on when an error is identified, corrections may be made
> before or after the last day of the full-Plan period, and before or after the affected
> payment has been released.

4

*Id.*, Ex. A (Pl. Dep. Ex. 4 at 3).

5

6

Plaintiff's IPL for the second half of 2016 also set forth when incentive payments were earned in a "Full-Plan Earnings" clause, which stated:

7

8

9

10

11

12

13

> **Full-Plan Earnings:** Regardless of your start date, your incentive payments are
> earned under the Plan terms, and are no longer considered Plan-to-Date advance
> payments, only after the measurement of complete business results following the
> end of the full-Plan period or (if applicable) after the measurement of complete
> business results after the date you left the Incentive Plan early. Incentive payments
> will be considered earned only if you have met all payment requirements, including:
> (1) you have complied with the Incentive Plan, the Business Conduct Guidelines
> and all other applicable IBM employment policies and practices; (2) you have not
> engaged in any fraud, misrepresentation or other inappropriate conduct relating to
> any of your business transactions or incentives; (3) and the customer has paid the
> billing for the sales or services transaction related to your incentive achievement.

14

15

16

*Id.*, Ex. A (Pl. Dep. 69:19-21, Ex. 4 at 4).  Prior to the dispute giving rise to this lawsuit, Plaintiff never discussed the meaning of the "Full-Plan Earnings" provision with anyone.  *Id.*, Ex. A (Pl. Dep. 69:18-25).

17

18

19

20

21

No one ever told Plaintiff that the disclaimers in the "Other Important Information" section of his IPL for the second half of 2016 did not apply to him.  *Id.*, Ex. A (Pl. Dep. 71:7-10).  No one ever told Plaintiff not to read the disclaimers in the "Other Important Information" section.  *Id.*, Ex. A (Pl. Dep. 71:2-6).  No one ever hid the disclaimers in the "Other Important Information" section from Plaintiff.  *Id.*, Ex. A (Pl. Dep. 71:11-13).

22

### D.  Alleged Representations Made by IBM

23

24

25

26

27

28

Plaintiff's IPL for the second half of 2016 contained a link to IBM's Incentives Workplace. *Id.*, Ex. A (Pl. Dep. 73:3-10, Ex. 4 at 2).  The Incentives Workplace contained educational information related to sales plans.  *Id.*, Ex. D (Martinotti Dep. 40:21-24).  The IPL defined the "Plan" to include not only the IPL but also the educational information contained on the Incentives Workplace.  *Id.*, Ex. A (Pl. Dep. 73:25-74:5, Ex. 4 at 2).  Included on the Incentives Workplace were various PowerPoints that explained how Plaintiff was to be paid.  *Id.*, Ex. A (Pl. Dep. 72:9-

7

1 | 73:24); Ex. D (Martinotti Dep. 40:21-41:4).

2 |      The only time Plaintiff saw anything in writing about his commissions being "uncapped"

3 | was in a PowerPoint presentation that explained Plaintiff's commissions plan. *Id.*, Ex. A (Pl. Dep.

4 | 75:14-20, 78:23-79:10); ECF No. 71 (Second Am. Compl.) ¶¶ 69, 81.  The PowerPoint contained

5 | the statements "payments uncapped" and "earnings opportunity remains uncapped." *Id.*, Ex. A (Pl.

6 | Dep. 75:14-20, 78:14-79:10).  This PowerPoint could be found on the Incentives Workplace and

7 | thus constituted part of the "Plan" referenced in Plaintiff's IPL. *Id.*, Ex. A (Pl. Dep. 72:4-73:24);

8 | ECF No. 71 (Second Am. Compl.) ¶¶ 17, 69, 81.  Plaintiff admits that prior to the commission

9 | dispute giving rise to this lawsuit, he never talked to anyone about whether payments or earnings

10 | opportunities were uncapped. *Id.*, Ex. A (Pl. Dep. 76:13-17, 79:15-25).

11 |      While the PowerPoint explains that IBM does not cap sales representatives' overall

12 | commissions or earnings, Plaintiff's IPL provides that IBM does have the right to adjust his

13 | commissions on significant transactions. *Id.*, Ex. C (Wirtenson Dep. 37:19-38:7, 38:17-20); Ex. B

14 | (Briggs Dep. 38:2-5, 42:4-9); Ex. A (Pl. Dep. Ex. 4).  In other words, an adjustment to commissions

15 | on a specific deal is not a cap on a sales representative's overall ability to earn commissions. *Id.*,

16 | Ex. E (Leeke Dep. 30:17-19); Ex. C (Wirtenson Dep. 37:19-38:7, 38:17-20); Ex. B (Briggs Dep.

17 | 38:2-5, 42:4-9).  Even though Plaintiff's commissions were reduced on the Oracle and Sabre deals,

18 | that did not affect his ability to earn commissions on other deals. *Id.*  Plaintiff seems to agree with

19 | this interpretation, as he testified that "when you're uncapped there's no limit to what you can

20 | earn." *Id.*, Ex. A (Pl. Dep. 78:19-20).

21 |     **E.**       **The Oracle Transaction**

22 |      Plaintiff participated in a deal between IBM and Oracle that closed in December 2016. *Id.*,

23 | Ex. A (Pl. Dep. 101:2-15).  The Oracle deal was a contract re-write/extension that was not on

24 | Plaintiff's radar until November 2016, a few weeks before it closed. *Id.*, Ex. A (Pl. Dep. 105:9-

25 | 109:10); Ex. C (Wirtenson Dep. 83:2-14).  Plaintiff was surprised in November when the deal

26 | gained traction. *Id.*, Ex. A (Pl. Dep. 109:11-17).  Once the deal closed, approximately $1.4 million

27 | in revenue credit was attributed to Plaintiff's portion of the Oracle deal. *Id.*, Ex. A (Pl. Dep. 101:9-

28 | 23).

F.      **The Sabre Transaction**

Plaintiff participated in a deal between IBM and Sabre that closed in December 2016.  *Id.*, Ex. A (Pl. Dep. 118:15-25).  Plaintiff did not become aware of the Sabre deal as a real possibility until mid-October to mid-November 2016.  *Id.*, Ex. A (Pl. Dep. 118:15-23).  The Sabre deal was a contract re-write/extension and was a $3 million total deal.  *Id.*, Ex. A (Pl. Dep. 117:2-18); Ex. C (Wirtenson Dep. 83:2-14).  Once the deal closed, approximately $1.5 million in revenue credit was attributed to Plaintiff's portion of the Sabre deal.  *Id.*, Ex. A (Pl. Dep. 117:16-18).  There were no new products sold as part of the Sabre deal.  *Id.*, Ex. A (Pl. Dep. 117:19-21).

G.      **Plaintiff Knew IBM Could Review His Commissions**

Plaintiff's commissions were reviewed previously in 2015 due to the size of his sales achievement.  *Id.*, Ex. A (Pl. Dep. 51:17-19, 53:9-14).  Briggs told Plaintiff that anyone with achievement over 400% automatically gets held for review.  *Id.*, Ex. A (Pl. Dep. 54:17-55:2).  Plaintiff knew that his third line manager had to approve his commission payments in this 2015 review because his achievement was over 400%.  *Id.*, Ex. A (Pl. Dep. 55:3-20).  Plaintiff's commissions were ultimately released in full in 2015, but due to the review, they were paid a month later than they would have been without any review.  *Id.*, Ex. A (Pl. Dep. 53:3-8).  After the Oracle and Sabre deals closed, Plaintiff expected that his commissions would be reviewed due to the size of the deals and because his commissions had been reviewed in 2015.  *Id.*, Ex. A (Pl. Dep. 129:2-8).

H.      **The Oracle and Sabre Transactions Triggered an "Account Level Inspection" of Plaintiff's Commissions**

There are several types of commission inspection processes triggered by significant transactions, one of which is an account level inspection.  *Id.*, Ex. D (Martinotti Dep. 13:8-16, 13:20-22).  Plaintiff's achievement for the second half of 2016 was over 250%, therefore, based on the significant transactions provision, an account level inspection was triggered.  *Id.*, Ex. D (Martinotti Dep. 15:1-16:10, 18:21-23, 24:2-9).  Because Plaintiff's achievement was over 400%, the account level inspection required approval from Plaintiff's third line manager, Don Leeke.  *Id.*, Ex. D (Martinotti Dep. 19:20-22, 22:20-24).  As part of the inspection, various items are reviewed.  These include making sure a sales representative's quota is set correctly, that the territory is set

9

1  correctly, that the commissions generated are commensurate with contribution on the deal, and that

2  the commissions distributed across the team are fair.  *Id.*, Ex. E (Leeke Dep. 52:14-16, 165:20-

3  166:1).  Pursuant to the terms of Plaintiff's IPL, commissions are not earned until the completion

4  of an account level inspection.  *Id.*, Ex. A (Pl. Dep. Ex. 4 at 4).

5      As part of the review, IBM reviewed Plaintiff's commissions on the Oracle and Sabre deals,

6  considering his quota, his work contribution on the deals and to ensure fairness and balance between

7  the employees involved in the transaction.  *Id.*, Ex. E (Leeke Dep. 52:14-16, 165:20-166:1).  To

8  determine Plaintiff's contribution on the Oracle and Sabre deals, Leeke (Plaintiff's third line

9  manager) spoke with Plaintiff's management including his second line manager and Plaintiff's prior

10  third line manager, Chris Bahr.  *Id.*, Ex. E (Leeke Dep. 45:2-16, 71:16-25, 73:25-74:15, 79:4-21).

11  During the review, Leeke discovered that Plaintiff's quota for the second half of 2016 was too low,

12  thus causing his achievement percentage to be extremely high, and did not accurately reflect the

13  territory opportunity because it did not contemplate the Sabre and Oracle deals.  *Id.*, Ex. E (Leeke

14  Dep. 130:17-131:8).  Specifically, at the time Plaintiff's quota was set, Briggs (Plaintiff's first line

15  manager) was not aware that the Oracle and Sabre deals were a possibility, so these large deals

16  were not considered when setting Plaintiff's quota for the second half of 2016 sales period.  *Id.*, Ex.

17  B (Briggs Dep. 134:5-13).  Plaintiff also concedes that he was not aware that the Oracle and Sabre

18  deals were a possibility until October or November 2016.  *Id.*, Ex. A (Pl. Dep. 105:9-109:17,

19  118:15-23).  As a result, Plaintiff's quota for the second half of 2016 of roughly $500,000 (which

20  was close to the minimum quota allowable) did not accurately reflect the sales opportunities he had

21  for that sales period.  *Id.*, Ex. C (Wirtenson Dep. 217:7-218:10).  Given this and because the work

22  delivered on the Oracle and Sabre deals was not in proportion to the payout because those deals

23  were contract extensions, Leeke made the decision to adjust Plaintiff's commissions.  *Id.*, Ex. E

24  (Leeke Dep. 47:20-48:11, 135:19-136:3).

25      Around February 15, 2017, Leeke initially suggested adjusting Plaintiff's commissions to

26  250% achievement of his quota due to Plaintiff's quota being set incorrectly and his work

27  contribution.  *Id.*, Ex. E (Leeke Dep. 111:13-16, 116:13-118:10).  Wirtenson and Leeke were still

28  discussing the appropriate commission payment for Plaintiff at the time.  *Id.*, Ex. E (Leeke Dep.

136:22-138:23).  On February 17, 2017, Plaintiff was held at 250% of his quota temporarily because final approval for payment had not yet been received from Leeke.  *Id.*, Ex. E (Leeke Dep. 139:11-140:3).   After discussions with Wirtenson and based on Wirtenson's recommendation, Leeke approved adjusting Plaintiff's commissions such that he would be paid full achievement for all other deals he closed during the sales period, but that his achievement would be adjusted to 150% of his quota for both the Oracle and Sabre deals; this would have resulted in a commission payment to Plaintiff of $610,000.   *Id.*, Ex. E (Leeke Dep. 142:5-147:4, 151:9-153:24, 164:15-165:19, 176:19-177:8); *Id.*, Ex. C (Wirtenson Dep. 206:14-208:13).   Ultimately, however, the Oracle and Sabre deals were adjusted to 200% of his quota each and Plaintiff was paid $709,000 in commissions for the second half of 2016.  *Id.*, Ex. C (Wirtenson Dep. 210:8-22, 212:5-213:23).

## I.   Other Deals Closed in the Second Half of 2016

IBM paid Plaintiff commissions on other deals he closed during the second half of 2016, and his commissions were not reduced on any of those deals.  *Id.*, Ex. A (Pl. Dep. 152:8-153:8). Specifically, Plaintiff closed 15 deals in the second half of 2016, and only his commissions on the Oracle and Sabre deals were adjusted.  *Id.*

## IV.   ARGUMENT AND CITATION TO AUTHORITY

### A.   Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the unmoving party."  *Thrifty Oil Co. v. Bank of Am. Nat'l . Trust & Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  On any claim that the non-moving party will have the burden of proof at trial, the movant may obtain summary judgment either by producing evidence negating an essential element of the non-moving party's claim or by merely pointing out an absence of evidence supporting the non-moving party's claim.  *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the movant satisfies this initial burden, then the opposing party must go beyond the pleadings and "show a genuine issue

1   of material fact by presenting *affirmative evidence* from which a jury could find in [its] favor."

2   *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009).   "[B]ald assertions or a mere scintilla of

3   evidence in his favor" will not suffice.   *Id*.  (citation omitted).  "If the nonmoving party fails to

4   produce enough evidence to create a genuine issue of material fact, the moving party wins the

5   motion for summary judgment." *Nissan Fire*, 201 F.3d at 1103.

6       **B.     Numerous Courts Have Rejected Similar Claims Based Upon the Plain Terms
            of the IPL**

7

8       This Court has held no less than three times that the disclaimers in the IPLs are enforceable

9   and enable IBM to make adjustments to commission payments.  *See Schwarzkopf v. IBM*, No. C

10  08-2715, 2010 U.S. Dist. LEXIS 46813 (N.D. Cal. May 12, 2010); *Pfeister v. IBM*, No. 17-cv-

11  03573-DMR, 2017 U.S. Dist. LEXIS 170970 (N.D. Cal. Oct. 16, 2017); and *Kemp v. IBM*, No.

12  3:09-cv-03683, 2010 U.S. Dist. LEXIS 118801(N.D. Cal. Nov. 4, 2010).   In *Schwarzkopf*, for

13  example, the plaintiff's commissions were governed by an incentive plan letter which contained

14  the same right to modify, significant transactions, and other disclaimers as are contained in

15  Plaintiff's IPL.  *Id.* at *4-5.  The plaintiff in *Schwarzkopf* assisted in closing a large deal with Cisco

16  that accounted for over 1,000% of the plaintiff's sales quota and would have resulted in the plaintiff

17  receiving more than $1.5 million in commissions.  *Id.* at *9-10.  IBM invoked its discretion under

18  the IPL's disclaimers to adjust the plaintiff's commissions and reduced the plaintiff's commissions

19  to approximately $550,000.  *Id.*  The plaintiff sued IBM after it adjusted his commissions.  *Id.* at

20  *1.  In granting IBM's motion for summary judgment, the court held that "[a]ny inferences that

21  may be drawn in [the plaintiff's] favor with respect to the circumstances or intent of the Quota letter

22  are insufficient to negate IBM's clear intent *not* to contract, or its express reservation of discretion

23  that inevitably limits any implied understanding of a promise to pay commission in full."  *Id.* at

24  *25.  (emphasis in original.)  Further, the court found that the express disclaimers in the incentive

25  plan "limit[ed] any sales representative's reliance on a specific commission payout for large sales."

26  *Id.* at *25.  Importantly, the plaintiff in *Schwarzkopf* asserted claims for promissory estoppel and

27  fraud based on alleged representations that his commissions would not be "capped" or adjusted.

28  *Id.* at *42-43.  This Court also dismissed those claims in light of the disclaimers contained in the

1   plaintiff's IPL.  *Id.* at *43-46.

2       Likewise, in *Pfeister*, the plaintiff sued IBM after it changed his quota, which had the impact

3   of reducing his commissions from $462,653 to $97,444.49.  *Id.* at *4.  This Court granted in part

4   IBM's motion for judgment on the pleadings and held that plaintiff "had no vested rights to any

5   specific amount of incentive pay under the Incentive Plan, since the plan reserved to IBM the right

6   to determine how much it would pay him and the right to adjust incentive payments."  *Id.* at *14.

7       This Court also addressed a similar situation in *Kemp*, when it granted IBM's motion to

8   dismiss California Labor Code claims in a nearly identical situation.[2]  In *Kemp*, a former sales

9   representative at IBM filed a lawsuit related to allegedly unpaid commissions, contending that IBM

10  unlawfully reduced his commissions on several occasions.  *Id.* at *1-5.  The plaintiff in *Kemp* filed

11  a variety of claims against IBM, including a number of claims under the California Labor Code.

12  *Id.* at *4-5.  The plaintiff had an incentive plan letter that had disclaimers nearly identical to those

13  contained in Plaintiff's IPL in this case.  *Id.* at *2-3.  In addressing the plaintiff's California Labor

14  Code claims, the *Kemp* court noted that "the right of a salesperson or any other person to a

15  commission depends on the terms of the contract for compensation."  *Id.* at *13 (citing *Koehl v.*

16  *Verio, Inc.*, 142 Cal. App. 4th 1313, 1330 (2006)).  The court then went on to grant IBM's motion

17  to dismiss the plaintiff's Labor Code claims because: (1) the disclaimers in the incentive plan

18  expressly stated that it did not constitute an express or implied contract, and (2) the plaintiff had

19  not earned any commissions under the plain terms of the incentive plan.  *Id.* at *13-16.[3]

20      The Central District of California has reached similar conclusions to this Court.  In *Gilmour*

21  *v. IBM*, No. CV 09-04155, 2009 U.S. Dist. LEXIS 127142 (C.D. Cal. Dec. 16, 2009), the court

22  granted IBM's motion for judgment on the pleadings in yet another unpaid commissions case based

23  upon similar disclaimers in the applicable incentive plan.  In *Gilmour*, a former sales representative

24

25  [2] Although the Court has dismissed the California Labor Code claims as standalone claims in this
    action, the reasoning from *Kemp* is still applicable to Plaintiff's others claims, including his Unfair
26  Competition Claim.  The disclaimers in Plaintiff's IPL, just as in *Kemp*, foreclose his claims.
    [3] Notably, in *Schwarzkopf* this Court held that the significant transaction clause permits IBM to
27  review and adjust commissions even after those commissions are "earned."  *Schwarzkopf*, 2010
    U.S. Dist. LEXIS 46813, at *30-31 ("[T]he Significant Transaction clause appears to allow
28  incentive payments that are disproportionate to territory or quota amount to be reviewed and
    adjusted at any point, including after the commission is 'earned' by completion of the sale.").

1  sued IBM, alleging claims for, *inter alia*, breach of contract and failure to pay wages owed under

2  the California Labor Code.  *Id.* at *1-4.  The plaintiff alleged that, after the end of the applicable

3  sales period, IBM informed her that it would not pay her any commissions related to the sales

4  period. *Id.* at *3-4.  The court dismissed plaintiff's Labor Code claim because "IBM never withheld

5  contractually-owed commissions from [Gilmour] since the Incentive Plan and Quota Letter did not

6  create an enforceable employment contract." *Id.* at *7-8.

7          This Court, agreeing with Judge Alsup's decision in *Beard v. IBM*, No. C 18-06783 WHA,

8  2019 U.S. Dist. LEXIS 60302 (N.D. Cal. Apr. 7, 2019), denied IBM's Motion to Dismiss Plaintiff's

9  Complaint in part allowing Plaintiff's misrepresentation claims and certain other state-law claims

10 to survive.  However, the Court now has a fully developed record which demonstrates that

11 Plaintiff's allegations in the Second Amended Complaint are not supported by the undisputed facts

12 and thus fail.  For example, the undisputed facts demonstrate that the PowerPoint and IPL are not

13 inconsistent.  While the PowerPoint explains that IBM does not cap sales representatives' overall

14 commissions or earnings, Plaintiff's IPL provides that IBM does have the right to adjust his

15 commissions on significant transactions.  Barnes Decl., Ex. C (Wirtenson Dep. 37:19-38:7, 38:17-

16 20); Ex. B (Briggs Dep. 38:2-5, 42:4-9); Ex. A (Pl. Dep. Ex. 4).  Additionally, the undisputed facts

17 show that while Plaintiff's commissions were adjusted on the Oracle and Sabre transactions, his

18 commissions on the 13 other deals he worked on in the second half of 2016 were not adjusted.  *Id.*,

19 Ex. A (Pl. Dep. 152:8-153:8).  Thus, it is undisputed that IBM did not cap Plaintiff's overall

20 earnings.

21          Additionally, the fully developed record has proven some of the allegations in Plaintiff's

22 Second Amended Complaint to be false.  For example, in his Complaint, Plaintiff alleged that his

23 first line and second line managers told him that commissions were uncapped.  *See* ECF No. 71

24 (Second Am. Compl.) ¶¶ 70. 82.  However, Plaintiff admits that prior to the deals at issue in this

25 case, he never spoke with any managers about whether commissions were uncapped.  *Id.*, Ex. A

26 (Pl. Dep. 76:13-17, 79:15-25).

27          Given the undisputed facts, the Court should dismiss Plaintiff's claims in their entirety.

28 ///

1

### C.   Plaintiff's Fraud Claim Fails

2          To prove his claim for fraud, Plaintiff must show: (1) a misrepresentation; (2) made with

3 knowledge of its falsity; (3) with the intent to induce reliance; and (4) which did induce a justifiable

4 reliance; (5) causing damages. *Schwarzkopf*, 2010 U.S. Dist. LEXIS 46813, at *42 (citing *Gabana*

5 *Gulf Distrib., Ltd. v. Gap Int'l Sales, Inc.*, No. C 06-02584 CRB, 2008 U.S. Dist. LEXIS 1658, at

6 *25 (N.D. Cal. Jan. 9, 2008)). Here, Plaintiff claims that IBM misrepresented that his commissions

7 would not be capped in the PowerPoints available on the Incentives Workplace.[4]  (Second Am.

8 Compl. ¶ 69.)  Plaintiff cannot show that IBM made false statements, that IBM had an intent to

9 deceive him, or that any alleged reliance by him was reasonable.

10             ***i.***        ***Plaintiff cannot show that IBM made false statements.***

11          With respect to the statements contained in the PowerPoint, Plaintiff cannot show that the

12 statements were false.  The statements Plaintiff relies upon in the PowerPoint to support his fraud

13 claim included statements that "payments" and "earnings opportunity" are uncapped.  Barnes Decl.,

14 Ex. A (Pl. Dep. 75:14-20, 78:23-79:10).  While the PowerPoint explains that IBM does not cap

15 sales representatives' overall commissions or earnings, Plaintiff's IPL makes clear that IBM does

16 have the right to adjust his commissions on significant transactions.  *Id.*, Ex. A (Pl. Dep. Ex. 4 at

17 4); Ex. C (Wirtenson Dep. 37:19-38:7, 38:17-20); Ex. B (Briggs Dep. 38:2-5, 42:4-9); Ex. D

18 (Martinotti Dep. 15:1-16:10, 18:21-23, 24:2-9).  In other words, an adjustment to commissions on

19 a specific deal is not a cap on a sales representative's overall ability to earn commissions.  *Id.*, Ex.

20 E (Leeke Dep. 30:17-19); Ex. C (Wirtenson Dep. 37:19-38:7, 38:17-20); Ex. B (Briggs Dep. 38:2-

21 5, 42:4-9).  Indeed, Plaintiff's definition of a cap is consistent with IBM's; Plaintiff stated: "when

22 you're uncapped there's no limit to what you can earn." *Id.*, Ex. A (Pl. Dep. 78:19-20).  Plaintiff

23 admits that IBM paid him commissions on other deals closed during the second half of 2016 and

24 that his commissions were not reduced on any of those deals. *Id.*, Ex. A (Pl. Dep. 152:8-153:8).

25 Thus, it is undisputed that Plaintiff's earnings opportunity was never in fact "capped," even where,

26

---

27 [4] Plaintiff also initially alleged in his complaint that managers at IBM told him his commissions were uncapped.  However, at his deposition, Plaintiff admitted that he never spoke with any
28 managers about whether his commissions were "uncapped" prior to the deals at issue in this case. *Id.*, Ex. A (Pl. Dep. 76:13-17, 79:15-25).

1    as here, his achievement significantly exceeded his quota.  As a result, Plaintiff cannot show that

2    statements in the PowerPoint were false.

3                    ii.       *Plaintiff cannot show that IBM intended to deceive him.*

4         Plaintiff also cannot show that IBM made any false representations with the requisite intent

5    to deceive him.  Here, IBM was upfront about its commissions policies and practices as evidenced

6    by the clear disclaimers contained in Plaintiff's IPL for the first half of 2016.  *Id.*, Ex. A (Pl. Dep.

7    68:24-69:3, 69:8-10, 69:19-21, 93:7-94:4, Ex. 4 at 3, 4).   These clear disclaimers foreclose

8    Plaintiff's argument that IBM intended to deceive him regarding the payment of his commissions.

9    *Vinson v. IBM*, 2018 U.S. Dist. LEXIS 164042, at *14 ("[r]egardless of the statements in the

10   PowerPoint and the alleged practice of not capping commissions, therefore, the plain language of

11   the IPL clearly disclaimed any intent on behalf of IBM to be committed to any commissions

12   payment requirement, including not capping."); *Schwarzkopf v. IBM*, 2010 U.S. Dist. LEXIS

13   46813, at *42-46 (dismissing the plaintiff's fraud and promissory estoppel claims where the

14   disclaimers in the plaintiff's IPL precluded reliance on any other statements regarding

15   commissions).   Therefore, Plaintiff's fraud claim fails because he cannot establish that IBM acted

16   with the requisite intent to deceive him.

17        The Fourth Circuit addressed this very situation in *Jensen v. IBM*, 454 F.3d 382 (4th Cir.

18   2006) and held that the disclaimers in IBM's incentive plans permitted IBM to impose a "cap" on

19   commissions notwithstanding prior representations that commissions were "uncapped" since the

20   disclaimers permitted IBM to change the terms of the incentive plan.   In *Jensen*, the plaintiff

21   brought a breach of contract claim under Virginia law against IBM after IBM reviewed and adjusted

22   his commissions related to a significant transaction with Bank of America.  The plaintiff in *Jensen*

23   also had an IPL with disclaimers (including a "Right to Modify or Cancel" clause) which were

24   materially identical to those contained in Plaintiff's IPL in this case.   *Id.*, 454 F.3d at 385.

25   Importantly, some of the incentives materials relied upon by the plaintiff in *Jensen* also contained

26   the word "uncapped," and the court held that such language still did not save the plaintiff's claims.

27   Specifically, the court noted that, even if plaintiff were correct in reading a particular "200% Rule"

28   as imposing a cap on his commissions – which the plaintiff alleged was inconsistent with the

                                                      16

1    "uncapped" language contained in other materials – "IBM would have been within its rights under

2    Jensen's purported contract to introduce the 200% Rule . . . for the first time after he closed the

3    IBM deal" in light of the clear disclaimers in the plan.  *Id.* at 389.  Plaintiff simply cannot show

4    any intent to deceive by IBM when IBM did precisely what Plaintiff's commission plan permitted

5    it to do: review and adjust his commissions on significant transactions.

6                       ***iii.***        ***Plaintiff cannot show he reasonably relied on any alleged false***
                                ***statements.***
7

8         A fraud claim requires proof of justifiable reliance under California law.  *Kenney v. Deloitte,*

9    *Haskins & Sells*, No. C 91-0590 BAC, 1992 U.S. Dist. LEXIS 14600, at *6 (N.D. Cal. Sept. 1,

10   1992).  As explained above, Plaintiff cannot demonstrate that IBM made any false representations

11   to him.  However, even if he could, Plaintiff nevertheless cannot show his reliance on allegedly

12   false statements made by IBM was reasonable.

13        First, Plaintiff accepted the terms of his IPL for the second half of 2016 on July 12, 2016.

14   *Id.*, Ex. A (Pl. Dep. 66:24-67:8).  By accepting the terms of his IPL, Plaintiff acknowledged that he

15   read and understood the contents of the IPL.  Barnes Decl., Ex. A (Pl. Dep. Ex. 4 at 2).  Plaintiff's

16   IPL for the second half of 2016 again informed him – like his previous IPLs had – that IBM reserved

17   the discretion to review and adjust commission payments.  *Id.*, Ex. A (Pl. Dep. 67:12-20, 68:24-

18   69:3, Ex. 4 at 3).  Additionally, the "Significant Transactions" clause in his IPL informed Plaintiff

19   of the possibility that his commissions might be reduced on certain deals.  *Id.*, Ex. A (Pl. Dep. 69:8-

20   10, 93:7-94:4, Ex. 4 at 4).  Plaintiff's IPL further explained that his commissions were not

21   considered "earned" under the IPL until after IBM completed its significant transactions review.

22   *Id.*, Ex. A (Pl. Dep. 69:19-21, Ex. 4 at 4).  In short, Plaintiff's IPL informed him that IBM could

23   review his commissions on significant transactions and that his commissions were not earned until

24   any review was complete.

25        Second, it is undisputed that, in 2015, IBM reviewed Plaintiff's achievement because it

26   triggered an account level inspection because it was over 250%.  *Id.*, Ex. A (Pl. Dep. 51:17-19,

27   53:9-14); *Id.*, Ex. D (Martinotti Dep. 18:21-23, 19:23-24).  While Plaintiff was ultimately paid his

28   full commissions in 2015, this process put Plaintiff on notice that his commissions on large deals

                                              17

1   were subject to review by IBM.  In fact, Plaintiff concedes that he expected his commissions to get

2   reviewed in the second half of 2016 given the amount of his achievement.  *Id.*, Ex. A (Pl. Dep.

3   129:2-8).  Thus, Plaintiff cannot credibly argue that he was not fully aware that IBM retained the

4   discretion to review and adjust his commissions on significant transactions given his previous

5   experience.

6          Importantly, IBM also made it clear in Plaintiff's IPL that the disclaimers were not limited

7   to the four corners of the IPL.  In other words, the Right to Modify or Cancel section does not state

8   that the *IPL* does not constitute an express or implied contract or a promise by IBM to make any

9   payments.  Rather, the IPL more broadly states that "[t]he *Plan* does not constitute an express or

10  implied contract or promise by IBM to make any distributions under it" and that "IBM reserves the

11  right to adjust the *Plan* terms."  *Id.*, Ex. A (Pl. Dep. 68:24-69:3, Ex. 4 at 3.)  The IPL defines "the

12  Plan" to include all of "the Incentive Plan information" contained on IBM's Incentives Workplace,

13  which is where Plaintiff and other salespeople could locate information about their incentive plans,

14  *including the PowerPoint so heavily relied upon by Plaintiff in this case.  Id.*, Ex. A (Pl. Dep. 72:9-

15  74:5); Ex. D (Martinotti Dep. 40:21-41:4).  Thus, the disclaimers in the IPL applied with equal

16  force to all of the educational materials contained on IBM's intranet, including the PowerPoint.

17         As discussed above, now that the Court has a fully developed record, Plaintiff's fraud claim

18  should be dismissed.  The record demonstrates that Plaintiff was fully aware that IBM could review

19  his commissions.  *Id.*, Ex. A (Pl. Dep. 51:17-19, 53:9-14); Ex. D (Martinotti Dep. 18:21-23, 19:23-

20  24).  Additionally, Plaintiff expected his commissions to trigger a review in the second half of 2016.

21  *Id.*, Ex. A (Pl. Dep. 129:2-8.)  Further, as discussed, the statements in the PowerPoint and IPL are

22  not inconsistent, but rather informed Plaintiff that his overall earnings would not be capped, but

23  that IBM reserved the right to review commissions on significant transactions, as it did here.  Thus,

24  IBM acted consistent with the statements in both the PowerPoint and IPL.

25         Other courts addressing nearly identical arguments have also held that the disclaimers in

26  the IPL foreclose reliance on any alleged statements to the contrary contained outside the IPL.  *See

27  Fessler v. IBM*, 2018 U.S. Dist. LEXIS 202725, at *15-21 (E.D. Va. Nov. 28, 2018) (dismissing

28  plaintiff's fraud claim because the disclaimers in the plaintiff's IPL rendered any reliance by the

1  plaintiff on statements that his commissions were uncapped unreasonable as a matter of law);

2  *Middleton v. IBM*, 2019 U.S. Dist. LEXIS 61308, at *10 (N.D. Ga. Jan. 2, 2019) ("Importantly,

3  Plaintiff alleges that 'the representations were made after [he] signed the IPL.' Given that Plaintiff

4  had read and acknowledged the terms of the IPL at the time the alleged misrepresentations were

5  made, any reliance by Plaintiff was not justifiable as a matter of law.")).

6          In summary, Plaintiff's fraud claim fails because: (1) he cannot show IBM made false

7  statements to him; (2) he cannot show IBM intended to deceive him; and (3) he was repeatedly

8  informed that IBM might review and adjust his commissions, rendering any reliance on any alleged

9  false statements unreasonable as a matter of law.  Thus, the Court should grant summary judgment

10  and dismiss Plaintiff's fraud claim.

11          **D.    Plaintiff's Negligent Misrepresentation Claim Fails**

12          Plaintiff's negligent misrepresentation is premised on the same alleged misrepresentations

13  which form the basis for Plaintiff's fraud claim.  To prove his claim for negligent misrepresentation

14  under California law, Plaintiff must establish: "(1) a misrepresentation of material fact; (2) without

15  reasonable ground for believing it to be true; (3) intent to induce reliance; (4) justifiable reliance;

16  and (5) resulting damage." *Stearns v. Select Comfort Retail Corp.*, No. 08-2746 JF, 2009 U.S. Dist.

17  LEXIS 48367, at *36 (N.D. Cal. June 5, 2009) (citing *Glen K. Jackson, Inc. v. Roe*, 273 F.3d 1192,

18  1200 n.2 (9th Cir. 2001)).

19          For the same reasons set forth above with respect to his fraud claim, Plaintiff's negligent

20  misrepresentation claim also fails because Plaintiff cannot establish any actual "misrepresentation"

21  or the requisite justifiable reliance. *See supra* Section IV(C)(iii). *See also Fessler*, 2018 U.S. Dist.

22  LEXIS 202725, at *15-21 (dismissing plaintiff's constructive fraud claim for same reasons as fraud

23  claim); *Middleton*, 2019 U.S. Dist. LEXIS 61308, at *15 (dismissing plaintiff's negligent

24  misrepresentation claim for same reasons as fraud claim); *Stearns*, 2009 U.S. Dist. LEXIS 48367

25  at *36-37 (dismissing negligent misrepresentation claim where it failed for the same reasons as

26  plaintiff's intentional misrepresentation claim).

27          **E.    Plaintiff's Quantum Meruit and Unjust Enrichment Claims Fail**

28          Quantum meruit (or quasi-contract) is an equitable remedy "implied by the law under which

1    a plaintiff who has rendered services benefitting the defendant may recover the reasonable value of

2    those services when necessary to prevent the unjust enrichment of the defendant." *In re De*

3    *Laurentis Ent. Grp. Inc.*, 963 F.2d 1269, 1272 (9th Cir. 1992). To state a claim for quantum meruit,

4    Plaintiff must show: (1) that he performed certain services for IBM; (2) that they were rendered at

5    IBM's request; and (3) and that they are unpaid. *Summit Estate, Inc. v. Cigna Healthcare of Cal.,*

6    *Inc.*, No. 17-CV-03871-LHK, 2017 U.S. Dist. LEXIS 167462, at *32 (N.D. Cal. Oct. 10, 2017).

7        Moreover, under California law, quantum meruit requires evidence of a plaintiff's

8    reasonable expectation of receiving compensation for services rendered. *Hofmann v. Exxon Corp.*,

9    No. C-93-0392, 1994 U.S. Dist. LEXIS 3518, at *6 (N.D. Cal. Mar. 18, 1994); *Huskinson & Brown*

10   *v. Wolf*, 32 Cal. 4th 453, 458 (2004). As explained in detail above, Plaintiff cannot show that he

11   had a reasonable expectation that IBM would pay him additional commissions in light of the clear

12   disclaimers contained in his IPL. *See supra* Section IV(C)(iii). Accordingly, Plaintiff's quantum

13   meruit claim fails since he cannot demonstrate that he had any reasonable expectation of receiving

14   additional commissions in light of the unambiguous disclaimers contained in his IPL.

15       Further, in addition to his salary, IBM paid Plaintiff over $700,000 in commissions for the

16   second half of 2016. Barnes Decl., Ex. A (Pl. Dep. 48:8-11, 151:11-17). IBM also paid Plaintiff

17   full commissions for other deals that closed during the second half of 2016. *Id.*, Ex. A (Pl. Dep.

18   152:8-153:8). Simply put, Plaintiff cannot show that IBM was unjustly enriched by Plaintiff

19   performing the job that he was paid roughly $800,000 to perform.

20       Lastly, numerous other courts have dismissed unjust enrichment and quantum meruit claims

21   by IBM sales representatives seeking allegedly unpaid commissions in light of the clear disclaimers

22   in IBM's commission plans. *See, e.g., Snyder v. IBM*, No. 1:16-cv-03596-WMR, 2019 U.S. Dist.

23   LEXIS 66583, at *13-16 (N.D. Ga. Mar. 18, 2019) (granting summary judgment on plaintiff's

24   unjust enrichment and quantum meruit claims where the plain terms of plaintiff's IPL foreclosed

25   any reasonable expectation that plaintiff would receive a specific amount of commissions); *Morris*

26   *v. IBM*, No. 1:18-cv-0042-LY, 2018 U.S. Dist. LEXIS 222568, at *9-11 (W.D. Tex. Nov. 29, 2018)

27   ("without any allegation that he provided IBM services beyond those contemplated by the IPL,

28   Morris is foreclosed from seeking further equitable relief"); *Middleton*, 2019 U.S. Dist. LEXIS

61308, at *15-17 (dismissing plaintiff's claims for unjust enrichment and quantum meruit because "the terms of the IPL make clear that IBM has complete discretion over the payment of commissions" and "Plaintiff does not allege that he provided a separate benefit for which he was not compensated in some way by his base salary arrangement."); *Fessler*, 2018 U.S. Dist. LEXIS 202725, at *13-15 (dismissing Fessler's quantum meruit and unjust enrichment claims and holding that "[b]ecause Fessler accepted these IPLs, and they clearly stated that IBM could modify or eliminate Fessler's commission payments, neither IBM nor Fessler could have reasonably expected that IBM would pay Fessler commissions greater than the commissions he received."); *Pero v. IBM*, No. 12-CV-07484 (KM), 2014 U.S. Dist. LEXIS 2461 (D.N.J. Jan. 2, 2014) (dismissing unjust enrichment claim by former IBM sales representative because plaintiff failed to establish his entitlement to additional commissions).

Thus, Plaintiff's quantum meruit and unjust enrichment claims fail.

### F.        Plaintiff's Unfair Competition Claim Fails

Section 17200 of the California Business & Professions Code prohibits four types of wrongful conduct: (1) an unlawful business act or practice; (2) an unfair business act or practice; (3) a fraudulent business act or practice; and (4) deceptive or misleading advertising. Plaintiff alleges that IBM violated the unlawful, unfair, and fraudulent prongs. *See* ECF No. 71 (Second Am. Compl. ¶ 58).

### i.        *Unfair and Fraudulent Prongs.*

Plaintiff claims that IBM violated the unfair and fraudulent prongs by (1) knowingly misrepresenting to Plaintiff the uncapped nature of his sales commissions and (2) willfully failing to pay all earned commissions wages to Plaintiff. *Id.* (Second Am. Compl. ¶ 58). These claims rely on Plaintiff's misrepresentation and unjust enrichment and quantum meruit claims. *Id.* (Second Am. Compl. ¶¶ 59-60). As discussed above, Plaintiff's claims for fraudulent and negligent misrepresentation and quantum meruit and unjust enrichment fail. *See supra* Sections IV(C), IV(D), and IV(E). Accordingly, his claim for violation of the unfair competition law premised on the unfair and fraudulent prongs likewise fails.

Defendant's Motion for Summary Judgment                           Case No.: 5:18-cv-04916-LHK

1

*ii.*        ***Unlawful Prong.***

2    Section 17200 can "borrow" any violation of state or federal law to satisfy the unlawful

3 business practice test, however, the inability to prove such an underlying claim defeats claims under

4 § 17200.   *Lazar v. Hertz Corp.*, 69 Cal. App. 4th 1494, 1507 (1999).   Plaintiff alleges that IBM

5 violated the unlawful prong by violating California Labor Code Sections 200, 201, 202, 204, and

6 2751 and applicable Industrial Welfare Commission Wage Orders.   *See* ECF No. 71 (Second Am.

7 Compl. ¶ 58).

8    Plaintiff has presented no evidence that IBM violated Labor Code Sections 200, 201, 202,

9 204, and any Industrial Welfare Commission Wage Orders.   Moreover, those claims also fail on

10 the merits:

11    -   Section 200 is simply a definition section with no mandate for employers.   *See* Cal. Lab.

12        Code. § 200.

13    -   Section 201 provides that upon discharge wages earned and unpaid are immediately due

14        and payable to the employee.   Cal. Lab. Code. § 201.   Additionally, Section 202 applies

15        to payment of wages to employees who have voluntarily resigned.   Cal. Lab. Code

16        § 202.   It is undisputed that Plaintiff is still employed by IBM, thus Sections 201 and

17        202 are inapplicable.   Barnes Decl., Ex. A (Pl. Dep. 23:2-18).

18    -   Section 204 provides that wages that are earned should be paid twice monthly (or once

19        monthly if the employee is exempt under the Fair Labor Standards Act).   Cal. Lab. Code

20        § 204.   Plaintiff has not alleged that he was not paid earned wages twice monthly in

21        accordance with Section 204.   It is undisputed that Plaintiff's IPL provides that

22        commissions are considered earned only after the measurement of complete business

23        results following the end of the full-Plan period.   Barnes Decl., Ex. A (Pl. Dep. 69:19-

24        21, Ex. 4 at 4.)   Thus, Plaintiff did not earn any commissions that were subject to review

25        until the review was completed.   Accordingly his claim for violation of Section 204

26        fails.

27    -   Plaintiff also claims that IBM violated "the applicable Industrial Welfare Commission

28        Wage Orders" but has presented no evidence as to what specific orders IBM violated.

1    All Plaintiff provides are bald assertions that IBM violated the law.  This is insufficient

2    to survive summary judgment.  *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009)

3    ("[B]ald assertions or a mere scintilla of evidence in his favor" will not suffice). (citation

4    omitted).

5    Plaintiff also rests his unlawful prong violation on Labor Code Section 2751, which

6    provides, in pertinent part, "Whenever an employer enters into a contract of employment with an

7    employee for services to be rendered within this state and the contemplated method of payment of

8    the employee involves commissions, the contract shall be in writing and shall set forth the method

9    by which the commissions shall be computed and paid."  IBM's IPL complies with this

10   requirement.  The IPL is in writing, as Plaintiff admits, and it explains, in extensive detail, the

11   manner in which commissions are calculated and paid.  Barnes Decl., Ex. A (Pl. Dep. Ex.

12   4.)  Plaintiff signed his IPL, indicating that he read, understood, and accepted its terms, additionally,

13   his IPL was acknowledged by IBM HR.  *Id.*  Nor has Plaintiff offered any evidence that he was

14   harmed by any alleged violation of Section 2751.  Thus, there is no basis for any claim by Plaintiff

15   that his IPL failed to comply with Section 2751, and this claim fails to provide the basis for a

16   violation of the Unfair Competition Law.

17   For the foregoing reasons, Plaintiff is unable to establish that IBM violated the Unfair

18   Competition Law.  Notably, this Court previously dismissed the Unfair Competition Law claim

19   asserted in the *Schwarzkopf* case.  *Schwarzkopf*, 2010 U.S. Dist. LEXIS 46813, at *46-48.

20   **G.     The Court Should Dismiss Plaintiff's Claim for Punitive Damages.**

21   Under California law, punitive damages are not available on claims arising from contract,

22   but only where it is proven by clear and convincing evidence that the defendant is guilty of

23   oppression, fraud, or malice.  Cal. Civ. Code § 3294.  Thus, Plaintiff is not eligible for punitive

24   damages unless his underlying claim for fraud is proven by clear and convincing evidence.  *Von*

25   *Grabe v. Spring PCS*, 312 F. Supp. 2d 1285, 1308-09 (S.D. Cal. 2003) (dismissing claim for

26   punitive damages where plaintiff did not plead the underlying claims).

27   As set forth above in Section IV(C), Plaintiff's fraud claim fails as a matter of law.  At a

28   minimum, Plaintiff cannot prove his fraud claim by *clear and convincing* evidence.  Therefore, the

23

1  Court should also dismiss Plaintiff's derivative claim for punitive damages.

2  **V.     CONCLUSION**

3          For the foregoing reasons, IBM respectfully requests that the Court grant its Motion for

4  Summary Judgment and dismiss this action in its entirety.

5  Dated:  July 25, 2019                              JACKSON LEWIS P.C.

6

7                                          By:    /s/ *Justin R. Barnes*
                                                  Tyler A. Brown
8                                                 Justin R. Barnes (*pro hac vice*)
                                                  Donald P. Sullivan
9                                                 Attorneys for Defendant
                                                  INTERNATIONAL BUSINESS
10                                                MACHINES CORPORATION

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28