1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DAVID SWAFFORD,<br><br>            Plaintiff,<br><br>    v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br><br>            Defendant. | Case No. 18-CV-04916-LHK<br><br>**ORDER GRANTING IN PART AND<br>DENYING IN PART DEFENDANT'S<br>MOTION FOR SUMMARY<br>JUDGMENT**<br><br>Re: Dkt. No. 82 |

Plaintiff David Swafford ("Swafford") brings the instant lawsuit against Defendant International Business Machines Corporation ("IBM"). Before the Court is IBM's motion for summary judgment. Having considered the parties' briefs, the relevant law, and the record in this case, the Court GRANTS in part and DENIES in part IBM's motion for summary judgment.

## I.     BACKGROUND

### A.  Factual Background

Swafford is a resident of Santa Clara County, California and a software sales representative at IBM since 2009. ECF No. 71 ("SAC") ¶¶ 7, 13. IBM is a New York corporation with its principal place of business in the state of New York. *Id.* ¶ 8. Swafford's compensation as an IBM

1

sales representative consisted of a base salary plus commissions. ECF No. 91-3 ("Swafford Depo.") at 48:8–11, 151:11–17. This case concerns Swafford's commission payments (also referred to as "incentive payments") and IBM's commission plan and policies.

**1. Facts Related to IBM's Commission Payments.**

Swafford had a written commission plan known as the Incentive Plan Letter ("IPL") for the second half of 2016 that covered the sales period from July 1, 2016 through December 31, 2016. ECF No. 83-7 ("IPL"). The IPL provided that Swafford's sales quota for the second half of 2016 was $512,600. IPL at 2. The IPL also provided information about Swafford's commissions.

First, the IPL provided that, without an IPL in place, an employee is "not eligible to receive any related incentive payments." *Id.* The IPL also defined the "Plan" as the incentive plan information contained in the IPL and at IBM's Worldwide Incentives Workplace website. *Id.*

Second, the IPL provided that IBM had the right to make changes to incentive payment rates or quotas. *Id.* at 3. The IPL stated:

> **Right to Modify or Cancel:** The Plan does not constitute an express or implied contract or a promise by IBM to make any distributions under it. IBM reserves the right to adjust the Plan terms, including, but not limited to, changes to sales performance objectives (including management-assessment objectives), changes to assigned customers, territories, or account opportunities, or changes to applicable incentive payment rates or quotas, target incentives or similar earnings opportunities, or to modify or cancel the Plan, for any individual or group of individuals, at any time during the Plan period up until any related payments have been earned under the Plan terms. Managers below the highest levels of management do not know whether IBM will or will not change or adopt any particular compensation plan; they do not have the ability to change the Plan terms for any employee; nor are they in a position to advise any employee on, or speculate about, future plans. Employees should make no assumptions about the impact potential Plan changes may have on their personal situations unless and until any such changes are formally announced by IBM.

*Id.*

Third, the IPL provided that IBM could change incentive payment calculations resulting from errors. *Id.* The IPL stated:

**Adjustments for Errors:** IBM reserves the right to review and, in its sole discretion, adjust or require repayment of incorrect incentive payments resulting from incomplete incentives processes or other errors in the measurement of achievement or the calculation of payments, including errors in the creation or communication of sales objectives. Depending on when an error is identified, corrections may be made before or after the last day of the full-Plan period, and before or after the affected payment has been released.

*Id.*

The IPL also provided that IBM may review significant transactions:

**Significant Transactions:** IBM reserves the right to review and, in its sole discretion, adjust incentive achievement and/or related payments associated with a transaction which (1) is disproportionate when compared with the territory opportunity anticipated during account planning and used for the setting of any sales objectives; or for which (2) the incentive payments are disproportionate when compared with your performance contribution towards the transaction.

*Id.* at 4.

Finally, the IPL explained how incentive payments are earned under the Plan:

**Full-Plan Earnings:** Regardless of your start date, your incentive payments are earned under the Plan terms, and are no longer considered Plan-to-Date advance payments, only after the measurement of complete business results following the end of the full-Plan period or (if applicable) after the measurement of complete business results after the date you left the Incentive Plan early. Incentive payments will be considered earned only if you have met all payment requirements, including: (1) you have complied with the Incentive Plan, the Business Conduct Guidelines and all other applicable IBM employment policies and practices; (2) you have not engaged in any fraud, misrepresentation or other inappropriate conduct relating to any of your business transactions or incentives; (3) and the customer has paid the billing for the sales or services transaction related to your incentive achievement.

*Id.*

Despite the IPL, IBM repeatedly made representations that Swafford's commissions would be uncapped. In particular, Swafford regularly received PowerPoint presentations, which IBM called "education" for IBM employees, that described the terms of the commission plans. *See* Swafford Depo. 81:8–20; ECF No. 83-23 ("2H 2016 PowerPoint presentation") at 1. These PowerPoint presentations stated that commissions for IBM sales people were uncapped. *See* Swafford Depo. 79:1–13.

3

During the second half of 2016, Swafford received and reviewed a PowerPoint presentation entitled "Our Purpose, Values & Practices" relating to "Your 2016 Incentive Plan" (the "2H 2016 PowerPoint presentation"). 2H 2016 PowerPoint presentation at 1. The 2H 2016 PowerPoint presentation stated that it served as "the primary 2016 education for IBM sales employees. It provides the information you need to understand your 2016 plan." *Id.* The 2H 2016 PowerPoint presentation also stated four times that "payments" and/or "earnings opportunit[ies]" are "uncapped." *Id.* at 10, 11, 14, 15. When Swafford reviewed the 2H 2016 PowerPoint presentation, Swafford understood these statements to mean that his commissions would be uncapped, and that "when you're uncapped, there's no limit to what you can earn." Swafford Depo. at 78:19–20. The 2H 2016 PowerPoint presentation did not reference any of the disclaimer provisions contained within the IPL. *See* 2H 2016 PowerPoint presentation. Swafford's former second line manager, Richard Wirtenson ("Wirtenson"), testified that IBM did not cap commissions in order to incentivize sales representatives to sell as much as they can. ECF No. 83-5 ("Wirtenson Depo.") at 96:3–6.

**2. The Sabre and Oracle Deals.**

In 2016, Swafford worked on behalf of IBM to close two major deals for IBM products and services with Oracle ("Oracle Deal") and Sabre ("Sabre Deal"). Wirtenson Depo. at 103:13–24, 104:1–15. Swafford testified that these deals were each challenging because Oracle was a competitor of IBM, Swafford Depo. at 103:17–25, and because Sabre had been considering moving away from IBM products, Swafford Depo. at 119:17–25, 120:1–3. During the relevant time period, Swafford's first line manager was Mark Briggs ("Briggs"), and Swafford's second line manager was Wirtenson. ECF No. 91-1 ("Martinotti Depo.") at 19:1–16. Briggs testified that Swafford performed exceptionally well in closing these deals for IBM. ECF No. 83-2 ("Briggs Depo.") at 78:15–16 ("Dave did an outstanding job closing multiple large transactions.").

**3. Swafford's Allegations that IBM Capped His Commissions.**

As a result of the Oracle and Sabre Deals, Swafford far exceeded his $512,600 quota for

4

the second half of 2016.  Indeed, Swafford's revenue credit across all of the deals that he closed in the second half of 2016, including the Oracle and Sabre Deals, was approximately $4,983,275. Wirtenson Depo. at 35:9–13.  On the basis of these amounts, Swafford's commission payment amount for the second half of 2016 was initially calculated to be $950,997.64.  *Id.* at 34:1–2, 8–20; Swafford Depo. 176:15–20.

Ordinarily, this commission payment would have been given to Swafford in January 2017. Swafford Depo. at 53:15–18.  However, because Swafford exceeded his quota for the second half of 2016 by more than 400%, Swafford's commission payment amount triggered an internal review.  Martinotti Depo. at 18:19–25, 19:1–25, 22:1–24.  In particular, Swafford's commission triggered an automatic review by his first and second line managers, Briggs and Wirtenson, as well as his third line manager, Don Leeke ("Leeke").  *Id.* at 22:1–25, 23:1–5.  Swafford had previously been subject to automatic review on the basis of large commission amounts that Swafford received in 2015.  Swafford Depo. at 51:18–20.  However, Swafford had believed that the purpose of this review was to "make sure a contract is signed, the amounts are correct, and— you know, and no decimal points missing, no approvals missing."  *Id.* at 51:20–23.

On January 12, 2017, IBM's commissions team in Brazil sent a request to Briggs to review and approve Swafford's achievement and commission payment amounts.  ECF No. 83-8 at 3. Briggs approved of the amounts.  *Id.* at 2–3.  On January 16, 2017, the commissions team then sent a request to Wirtenson to review and approve the amounts.  *Id.* at 2.  Wirtenson also approved of the amounts.  *Id.* at 1.  Finally, the commissions team sent a request to Leeke to review and approve the amounts.  *Id.*

Leeke expressed concern about the size of the proposed commission payment.  ECF No. 83-9 at 2.  Leeke requested confirmation of the underlying figures as well as "a short business justification to support results and payout."  *Id.*  Briggs responded and provided additional information about the relevant transactions, and Briggs also indicated that "[t]hese wins were all led by and closed by Dave Swafford."  *Id.* at 1.  Leeke continued to express concern, however.

5

Leeke contacted several other IBM employees and opined that the proposed commission payment amount to Swafford was "insane" relative to the industry baseline. *Id.* Laurie Evans ("Evans"), another IBM executive, agreed with Leeke that the proposed amount was "way too steep of a pay out," and asked whether IBM had caps. ECF No. 83-10 at 1; Martinotti Depo. at 62:3–4.

Leeke requested a copy of Swafford's IPL and asked whether it contained "a cap or language that allows for management limit on payout" because the proposed commission payment to Swafford seemed "excessive." ECF No. 83-11 at 2. Another IBM employee directed Leeke to the IPL Adjustments for Error and Significant Transactions provisions and said that "these are 2 paragraphs that address this." *Id.* at 1. Leeke then suggested that IBM reset Swafford's quota to "around $4M," which would have the effect of reducing Swafford's achievement to "roughly 250% attainment and a great payout but obviously less than what is below." *Id.*

Evans informed Leeke that another IBM employee had told Evans that "IBM does not cap IQPs (!)," and Evans therefore suggested that Leeke "check with HR and Legal" before proceeding. ECF No. 83-12 at 1. However, Leeke testified that Leeke believed "IBM can cap" individual commissions, so long as IBM did not cap an employee's overall earnings. ECF No. 91-2 ("Leeke Depo.") at 31:8–11, 98:11–18.

Eventually, Leeke did not approve of the proposed commission payments to four IBM employees: Swafford, two other sales representatives on Swafford's team, and their first line manager, Briggs. ECF No. 83-14 at 1. On February 15, 2017, Leeke informed Wirtenson and several other IBM employees that Leeke was uncomfortable paying Swafford and the other members of Swafford's team commissions greater than 250% of their quotas. *Id.* Leeke indicated that he arrived at this conclusion because Leeke did not believe that the quotas for these employees "accurately represented the yields we expect from our partner/channel teams," and because Leeke did not believe the "team moved mountains for this attainment." *Id.* Wirtenson expressed concern about Leeke's decision. *Id.* According to Wirtenson, if "the team knew they would get capped at 250%, we would have probably book [*sic*] $5M less," and Wirtenson worried

that he would "lose a few good people over this." *Id.*

Wirtenson wrote to Leeke to persuade him not to go forward with the plan to limit Swafford and the other members of his team to 250% of their quotas. ECF No. 83-15 at 1. Wirtenson argued that if Leeke intended to proceed with his approach, however, "a better way would be to have a hard cap in the IPL's." *Id.*

On February 23, 2017, Briggs sent Swafford an email with the subject line, "2016 Commissions Cap," in which Briggs informed Swafford that Swafford's commission would be "capped at 250% of plan." ECF No. 83-32 at 1.

Briggs also sent a similar email to another member of Swafford's team who would be impacted by Leeke's proposal. *See* ECF No. 83-22 at 3. Briggs copied Wirtenson and Scott Kingston ("Kingston"), another second line manager, on both of these emails. ECF Nos. 83-32 at 1, 83-22 at 3. Kingston had overall responsibility for IBM's embedded software sales program in North America. Wirtenson Depo. at 121:3–18. Kingston responded to Briggs and complained that Leeke's approach would lead to a "loss of a sense of integrity" on the part of IBM. *See* ECF No. 83-22 at 3. Kingston explicitly worried that reducing commission payments to Swafford's team would "undermine [IBM's] own promise" to the IBM sales representatives. *Id.* at 2. In particular, Kingston asserted that to "change the plan after the game is over is not fair, and no one can rationalize it otherwise honestly." *Id.* at 1. Kingston strenuously argued that IBM should not go forward with Leeke's proposal or engage in arbitrary capping in general: "Plus it's just not an honorable way for a [*sic*] ethical company to react. I believe in honest, fairness, and integrity. We have a team that believes in us. If we don't handle this better, none of them will trust us again. We need to reconsider this." *Id.* at 2.

In March 2017, Wirtenson proposed three alternative approaches that would result in Swafford's receipt of a larger commission than Leeke had proposed. ECF No. 83-17 at 4. Wirtenson testified that he made these suggestions because Wirtenson "didn't think that 250 percent, which was called a cap, was fair," and Wirtenson "was trying to come up with something

that [he] believed was more in the line with what [he] thought Dave [Swafford] should earn." Wirtenson Depo. at 174:14–19. Of these options, Wirtenson proposed that IBM "deal cap" the Oracle and Sabre Deals "at 150% of [Swafford's] quota." ECF No. 83-17 at 4. Wirtenson explained that if Leeke still believed that the resulting payment to Swafford "is too rich, we could cap all of his deals individually at 100% of his quota, which would probably knock the payment down another 100K." *Id.* Leeke ultimately approved Wirtenson's suggestion to "deal cap" the Oracle and Sabre Deals at 150% of Swafford's quota. *Id.* at 3. Accordingly, Swafford was ultimately paid $709,679.13 in commissions for the second half of 2016, not the $950,997.64 that had been initially calculated before the reductions.[1] *Id.* at 1.

On May 1, 2017, Swafford wrote an email to Wirtenson in which Swafford requested an explanation for why Swafford was not fully paid for the Oracle and Sabre Deals. ECF No. 83-31 at 2. Wirtenson replied that Wirtenson had "made the recommendation to Don [Leeke] that we pay on all other deals 100% but CAP the Oracle and Sabre transactions at 150% of your quota on each." *Id.* at 1. Wirtenson said that this explained the reduction in Swafford's commissions for the Oracle and Sabre Deals. *Id.* Wirtenson and Briggs both testified that they had never before seen a reduction of commissions in similar circumstances at IBM. Wirtenson Depo. 138:8–21; Briggs Depo. 44:17–20.

## B. Procedural History

Swafford filed his initial complaint against IBM on August 14, 2018, which alleged that IBM owes him unpaid commissions related to the Oracle and Sabre Deals. ECF No. 1. Swafford's initial complaint asserted claims for: (1) breach of oral and/or implied contract; (2) quantum meruit; (3) unjust enrichment; (4) fraudulent misrepresentation; (5) negligent misrepresentation; (6) violation of the California Labor Code; (7) violations of the California

---

[1] The $709,679.13 figure suggests that the Oracle and Sabre Deals were actually each set at 200% of Swafford's quota, not 150% of Swafford's quota, as Leeke and Wirtenson had intended. Wirtenson Depo. at 209:23–24, 210:1–4. Wirtenson testified that this miscalculation likely resulted from the language barrier between Wirtenson and the IBM commissions team in Brazil. *Id.* at 212:5–15.

Case No. 18-CV-04916-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200; and (8) punitive damages. *Id.*

On October 19, 2018, IBM moved to dismiss Swafford's initial complaint. ECF No. 24. On November 2, 2018, Swafford filed his first amended complaint. ECF No. 32. As a result, the Court denied as moot IBM's motion to dismiss Swafford's initial complaint on November 12, 2018. ECF No. 39.

In his November 2, 2018 amended complaint, Swafford asserted claims for: (1) "[v]iolation of California Labor Code"; (2) violations of the UCL, Cal. Bus. & Prof. Code § 17200; (3) fraudulent misrepresentation; (4) negligent misrepresentation; (5) quantum meruit; (6) unjust enrichment; and (7) punitive damages.

On November 16, 2018, IBM moved to dismiss Swafford's first amended complaint. ECF No. 42. On April 17, 2019, the Court issued an order granting in part with prejudice, granting in part without prejudice, and denying in part IBM's motion to dismiss Swafford's first amended complaint ("Order on the Motion to Dismiss"). ECF No. 69.

On May 16, 2019, Swafford filed his second amended complaint ("SAC"). ECF No. 71 ("SAC"). In the SAC, Swafford asserts claims for: (1) violations of the UCL, Cal. Bus. & Prof. Code § 17200; (2) fraudulent misrepresentation; (3) negligent misrepresentation; (4) quantum meruit; (5) unjust enrichment; and (6) punitive damages. SAC ¶¶ 55–105. IBM answered the SAC on May 28, 2019. ECF No. 74.

IBM filed the instant motion for summary judgment on July 25, 2019. ECF No. 82 ("Mot."). Swafford opposed the motion for summary judgment on August 21, 2019, ECF No. 83 ("Opp."), and IBM replied on September 5, 2019, ECF No. 85 ("Reply"). Further, on September 30, 2019, IBM filed a statement of recent decision in support of the motion for summary judgment. ECF No. 93.

## II.     LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*

The Court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* The burden then shifts to the nonmoving party to "go beyond the pleadings, and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotations omitted).

For purposes of summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the Court must assume the truth of the evidence submitted by the nonmoving party. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The Court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

## III. DISCUSSION

As discussed above, in the SAC, Swafford asserts claims for: (1) violations of the UCL, Cal. Bus. & Prof. Code § 17200; (2) fraudulent misrepresentation; (3) negligent misrepresentation; (4) quantum meruit; (5) unjust enrichment; and (6) punitive damages. SAC ¶¶ 55–105.

IBM argues that IBM is entitled to summary judgment on each of the foregoing claims.

United States District Court
Northern District of California

Mot. at 15–23. First, IBM argues that Swafford's fraudulent misrepresentation claim fails because Swafford has failed to show that a reasonable jury could find that IBM's statements were false, that IBM intended to deceive Swafford, or that Swafford reasonably relied on the allegedly fraudulent statements. *Id.* at 12–19. Second, IBM argues that Swafford's negligent misrepresentation claim fails because Swafford cannot establish that a reasonable jury could find that IBM's statements were false or that Swafford reasonably relied on the allegedly fraudulent statements. *Id.* at 19. Third, IBM argues that Swafford's quantum meruit and unjust enrichment claims fail because of the "clear disclaimers in IBM's commission plans," and because Swafford cannot show that Swafford had a reasonable expectation of additional commissions or that the commissions Swafford received were insufficient. *Id.* at 19–21. Fourth, IBM argues that Swafford's unfair business practices in violation of California's UCL, Cal. Bus. & Prof. Code § 17200, claim fails because it is derivative of Swafford's other insufficient claims and because IBM satisfied California Labor Code Section 2751. *Id.* at 21–23. Fifth, and finally, IBM argues that the Court should grant summary judgment on Swafford's claim for punitive damages because the punitive damages claim is derivative of Swafford's fraudulent misrepresentation claim. *Id.* at 23–24.

IBM also argues more generally that IBM is entitled to summary judgment on the basis of three cases from this district. Mot. at 12–14. The Court begins by analyzing these three cases. The Court then addresses in turn IBM's motion for summary judgment as to each claim alleged by Swafford below. For the reasons given below, the Court GRANTS in part and DENIES in part IBM's motion for summary judgment.

## A. The Three Cases IBM Cites From this District Do Not Entitle IBM to Summary Judgment.

As an initial matter, IBM cites three cases from this district that IBM argues entitle it to summary judgment in the instant case: *Pfeister v. IBM Corp.*, 2017 WL 4642436 (N.D. Cal. Oct. 16, 2017); *Kemp v. IBM Corp.*, 2010 WL 4698490 (N.D. Cal. Nov. 8, 2010); and *Schwarzkopf v. IBM, Inc.*, 2010 WL 1929625 (N.D. Cal. May 12, 2010). According to IBM, these cases

11

demonstrate that "the disclaimers in the IPLs are enforceable and enable IBM to make adjustments to commission payments." Mot. at 12. IBM suggests that the Court should "dismiss Plaintiff's claims in their entirety" on the basis of these cases. *Id.* at 14. Swafford disagrees. Swafford argues that these cases involved different claims and facts from the ones in the instant case, and that they are therefore distinguishable. Opp. at 15–17. The Court agrees with Swafford. The three cases cited by IBM are highly distinguishable from the instant case, and they do not entitle IBM to summary judgment.

The two most recent cases cited by IBM, *Pfeister*, 2017 WL 4642436 (N.D. Cal. Oct. 16, 2017), and *Kemp*, 2010 WL 4698490 (N.D. Cal. Nov. 8, 2010), exclusively concerned breach of contract and labor code claims that are not at issue in the instant case. *See Pfeister*, 2017 WL 4642436, at *5 (explaining that plaintiff alleged claims for breach of contract, and under California Labor Code §§ 202 and 204); *Kemp*, 2010 WL 4698490, at *4 (explaining that plaintiff alleged claims under California Labor Code §§ 221, 1174.5, 1199, and 2699). Neither case concerned any allegation of misrepresentation by IBM whatsoever, much less the specific alleged misrepresentations in the instant case. For this reason, Judge William Alsup of the United States District Court for the Northern District of California recently rejected the relevance of these two decisions in a case that involved claims similar to the instant case. *See Beard v. IBM Corp.*, 2019 WL 1516592, at *4 n.2 (N.D. Cal. Apr. 7, 2019) (rejecting the relevance of *Pfeister* and *Kemp* because "[n]either of these decisions address allegations regarding statements made by IBM's managers or in IBM's PowerPoint presentations"). The Court agrees that these two cases do not support IBM's motion for summary judgment in the instant case.

The third case cited by IBM, *Schwarzkopf v. IBM, Inc.*, 2010 WL 1929625 (N.D. Cal. May 12, 2010), did involve a claim for fraudulent misrepresentation. However, in the instant case, the Court previously addressed and distinguished *Schwarzkopf* in its Order on the Motion to Dismiss. ECF No. 69 at 15. Unlike the instant case, the sole alleged fraudulent misrepresentations in *Schwarzkopf* came from the plaintiff's managers, and the *Schwarzkopf* court concluded that these

United States District Court
Northern District of California

managers lacked the intent to defraud the plaintiff based on the managers' efforts to ensure that the plaintiff received full commissions. *See Schwarzkopf*, 2010 WL 1929625, at *14 (explaining that because the "managers in question emailed upper management in an effort to confirm" that plaintiff would be paid full commissions, the managers lacked intent to defraud). As discussed below, however, in the instant case, Swafford has established a genuine issue of material fact with respect to whether IBM possessed an intent to defraud Swafford. *See infra* Part III.B.3.

Accordingly, the Court concludes that the three cases from this district that IBM cites do not entitle IBM to summary judgment.[2] The Court therefore proceeds to consider whether IBM is entitled to summary judgment based on the arguments IBM raises against Swafford's individual claims. The Court considers these claims in turn.

### B. There is a Genuine Issue of Material Fact with Respect to Whether IBM Committed Fraudulent Misrepresentation.

Swafford brings a claim for fraudulent misrepresentation. SAC ¶¶ 68–78. For the elements of fraud, the Court looks to state law. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009). In California, the elements of fraud are: (1) a misrepresentation; (2) made with knowledge of its falsity (scienter); (3) with the intent to defraud, *i.e.*, to induce reliance; (4) which did induce reasonable reliance; (5) causing damages. *Id.* (citation omitted).

As an initial matter, Swafford's fraudulent misrepresentation claim is based on two different categories of statements made by IBM. The first category of statements consists of representations made in "PowerPoints, which, [*sic*] IBM sent to Mr. Swafford to explain his commissions for the 2H 2016 sales period." SAC ¶ 69. The second category of statements consists of "the statements by IBM executives and Managers that commissions would not be capped [that] were made directly to Mr. Swafford at the beginning of each sales period." *Id.*

---

[2] IBM briefly argues that these three cases are consistent with a case from the Central District of California, *Gilmour v. IBM Corp.*, 2009 WL 8712153 (C.D. Cal. Dec. 16, 2009). However, *Gilmour* is inapposite because it exclusively concerned a claim for breach of contract and a claim under California Labor Code § 221, neither of which are at issue in the instant case. *Gilmour*, 2009 WL 8712153, at *2–3.

13

With respect to the second category of allegedly fraudulent statements, in Swafford's opposition to IBM's motion for summary judgment, Swafford "voluntarily withdraws any claims based on such oral representations." Opp. at 16 n.11. Accordingly, the Court GRANTS IBM's motion for summary judgment on Swafford's fraudulent misrepresentation claim to the extent that the claim is based on oral statements uttered by IBM executives and managers.

The Court proceeds to analyze IBM's motion for summary judgment on Swafford's fraudulent misrepresentation claim to the extent that the claim is based on the statements contained within the 2H 2016 PowerPoint presentation.[3] As discussed above, the 2H 2016 PowerPoint presentation stated four times that "payments" and/or "earnings opportunit[ies]" are "uncapped." 2H 2016 PowerPoint presentation at 10, 11, 14, 15. Further, the record indicates that these statements or similar ones appeared in other PowerPoint presentations over the years. Swafford Depo. 79:1–13.

IBM argues that IBM is entitled to summary judgment on Swafford's fraudulent misrepresentation claim because Swafford has failed to create a genuine issue of material fact sufficient to show: (1) that IBM's challenged statements were false; (2) that IBM possessed the intent to defraud Swafford; and (3) that Swafford reasonably relied on the challenged statements. The Court addresses each argument below.

**1. There Is a Genuine Issue of Material Fact with Respect to Whether IBM's Statements Were False.**

As discussed above, under California law, the first element of a claim for fraud requires that the statement at issue be false. *Kearns*, 567 F.3d at 1126. Whether a statement is indeed false is a question of fact under California law. *See, e.g.*, *Intrieri v. Superior Court*, 117 Cal. App. 4th

---

[3] It is unclear whether Swafford's fraudulent misrepresentation claim is based solely on the statements contained within the 2H 2016 PowerPoint presentation, or whether it is based on similar statements contained within previous PowerPoint presentations as well. *See* SAC ¶ 69 (outlining fraud claim based on "the PowerPoints" used "to explain [Swafford's] commissions for the 2H 2016 sales period"). However, Swafford focuses exclusively on the 2H 2016 PowerPoint presentation in his opposition to IBM's motion for summary judgment, so the Court also focuses on this single PowerPoint presentation in analyzing the propriety of summary judgment. *See, e.g.*, Opp. at 17–24 (describing statements made in "the PowerPoint").

Case No. 18-CV-04916-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

72, 87 (2004) (explaining that whether statements at issue "were false is a triable question of material fact").

IBM argues that "[w]ith respect to the statements contained in the PowerPoint, Plaintiff cannot show that the statements were false." Mot. at 15. Specifically, IBM argues that the allegedly fraudulent statements in the 2H 2016 PowerPoint presentation can only be read to indicate "that IBM does not cap sales representatives' *overall commissions or earnings*." *Id.* (emphasis added). Thus, IBM could adjust a sales representative's commission on individual transactions such as the Oracle and Sabre Deals. *Id.* Accordingly, IBM claims that the allegedly fraudulent statements in the 2H 2016 PowerPoint presentation were true and consistent with the reduction of Swafford's commissions for the Oracle and Sabre Deals in the instant case. *Id.*

Swafford disagrees. First, Swafford argues that evidence in the record suggests that the allegedly fraudulent statements in the 2H 2016 PowerPoint presentation meant that IBM could not adjust or cap a sales representative's commission on individual transactions such as the Oracle and Sabre Deals. Opp. at 17. Second, Swafford argues that even if the allegedly fraudulent statements in the 2H 2016 PowerPoint presentation were construed in the way IBM argues, there is still a genuine issue of material fact with respect to whether the statements were false. Opp. at 19–21.

The Court agrees with Swafford. The Court concludes that the meaning of the statements contained within the 2H 2016 PowerPoint presentation is disputed, and some witnesses understood these statements to mean that IBM could not adjust or cap a sales representative's commission on individual transactions such as the Oracle and Sabre Deals. Therefore, there is a genuine issue of material fact with respect to the falsity of those statements. Accordingly, the Court need not reach Swafford's alternative argument that even assuming IBM's interpretation of the 2H 2016 PowerPoint presentation's language is correct, there would still be a genuine issue of material fact with respect to falsity.

Numerous witnesses testified that IBM "caps" earning payments and earning opportunities whenever it reduces the amount an employee would earn on individual transactions, like the

15

Oracle and Sabre Deals. Swafford understood the 2H 2016 PowerPoint presentation's language in this way. *See* Swafford Depo. at 75:18–76:12; Briggs Depo. at 43:16–18. Leeke, Swafford's third line manager, also seemingly understood the language this way, and claimed that IBM in fact imposed "cap[s] based on a deal." *See* Leeke Depo. at 30:17–21.

Further, although Briggs testified that Briggs currently agrees with IBM's interpretation of the allegedly fraudulent statements in the 2H 2016 PowerPoint presentation, Briggs also explained that Briggs did "[n]ot necessarily" disagree with Swafford's interpretation of the language. Briggs Depo. at 43:19–20. In fact, Briggs testified that Briggs himself previously *shared* Swafford's interpretation of the meaning of the references to "uncapped" in the 2H 2016 PowerPoint presentation, but that Briggs's own view subsequently changed only upon a conversation with management. *See id.* at 38:8–11. In his testimony, Briggs ultimately described "capped" as a "weird word," with a definition that depends in part on "how my mind works versus someone else's mind." *See id.* at 39:4–6, 43:20–22.

Finally, in the emails exchanged between IBM employees in the course of deliberations over whether to reduce Swafford's commissions for the Oracle and Sabre Deals, IBM employees directly referred to the contemplated reductions of Swafford's commissions as "caps." *See, e.g.*, ECF 83-17 at 4. Indeed, Wirtenson told other employees that the reductions that IBM ultimately imposed on Swafford's commissions for the Oracle and Sabre Deals "essentially capped the (2) deals." *Id.* at 2. Later, when Wirtenson informed Swafford of what had happened to the Oracle and Sabre Deals, Wirtenson said that IBM had decided to "CAP the Oracle and Sabre transactions at 150% of your quota on each." ECF No. 83-31 at 2.

In short, there is a genuine issue of material fact with respect to the meaning of the 2H 2016 PowerPoint presentation's guarantee of "uncapped" payments and earning opportunities. In similar situations, and faced with conflicting evidence of this nature, California courts have allowed questions of statements' falsity to go to a jury. For instance, in *Intrieri v. Superior Court*, 117 Cal. App. 4th 72 (2004), the California Court of Appeal considered the operator of a nursing

16

home's statements that the nursing home was "secure" and accessible only by "authorized persons." 117 Cal. App. 4th at 87. The *Intrieri* court declared that there was conflicting evidence about the accuracy of these statements. *See id.* Accordingly, the *Intrieri* court concluded that because these statements were at least "arguably false," the question of whether they amounted to misrepresentations should therefore survive summary judgment. *See id.*; *see also Ohio Six Ltd. v. Motel 6 Operating L.P.*, 2012 WL 12886208, at *11 (C.D. Cal. Nov. 16, 2012) (holding that because a party "raised triable issues of fact as to whether a misrepresentation was made," summary judgment was improper).

The instant case is similar. Because there is conflicting evidence about the meaning and accuracy of the 2H 2016 PowerPoint presentation's assurances of "uncapped" payments and "uncapped" earning opportunities, there is a genuine issue of material fact concerning whether the statements were false under California law. The Court therefore concludes that IBM is not entitled to summary judgment on Swafford's fraudulent misrepresentation claim on the basis of falsity. The Court proceeds to consider whether IBM is entitled to summary judgment on this claim because IBM did not possess the intent to defraud Swafford.

### 2. There Is a Genuine Issue of Material Fact with Respect to Whether IBM Intended to Defraud Swafford.

IBM also argues that there is no genuine issue of material fact with respect to whether IBM made any allegedly false representations with an intent to defraud Swafford. In particular, IBM claims that the disclaimers contained within the incentive plan letter ("IPL") for the second half of 2016 "foreclose [Swafford's] argument that IBM intended to deceive him regarding the payment of his commissions." Mot. at 16. Swafford responds by arguing that "there is plenty of evidence, direct and circumstantial," that could support a finding that IBM intended to defraud Swafford. Opp. at 23.

The Court agrees with Swafford. There is sufficient evidence in the record to create a genuine issue of material fact with respect to whether IBM intended to deceive Swafford.

California law requires that a misrepresentation be made "with intent to defraud." *See*

17

*Kearns*, 567 F.3d at 1126. This element "can be satisfied by circumstantial evidence." *Moses v. Harward*, 2014 WL 12577167, at *15 (N.D. Cal. May 27, 2014); *see also Santoro v. Carbone*, 22 Cal. App. 3d 721, 727 (1972) ("Since direct proof of fraudulent intent is often impossible, the intent may be established by inference from acts of the parties.").

In the instant case, there is sufficient evidence in the record to establish a genuine issue of material fact concerning whether IBM intended to defraud Swafford. The Court previously held that Swafford plausibly alleged IBM's intent to deceive by pointing in part to the fact that "IBM would be unable to recruit good sales representatives if IBM informed sales representatives that their commissions would be capped." ECF No. 69 at 12. There is now evidence in the record to support this allegation. In particular, when Wirtenson learned of Leeke's initial proposal to reduce Swafford's commissions, Wirtenson explicitly worried that IBM would "lose a few good people over this." ECF No. 83-13 at 1.

Additionally, Wirtenson explained that if Leeke reduced the commissions, "we would have probably book [*sic*] $5M less," which suggests that Wirtenson viewed the promise of uncapped commissions to be strong motivation for employees. *Id.* This, too, is relevant circumstantial evidence that supports the existence of intent to defraud on the part of IBM. *See Beard*, 2019 WL 1516592, at *5 (upholding allegation of intent to defraud concerning commission program that "was highly motivating to sales representatives and incentivized them to pursue large deals despite long hours and repeated out-of-town travel").

Further, there is evidence in the record that IBM employees considered IBM's behavior in reducing the commission payments to be dishonest. Indeed, in February 2017, Scott Kingston, an IBM second line manager with overall responsibility for IBM's embedded software sales program in North America, emailed Wirtenson and Briggs to complain that Leeke's proposal to reduce commission payments would lead to a "loss of a sense of integrity" on the part of IBM. ECF No. 83-22 at 3. Kingston explicitly worried that reducing commission payments to Swafford's team would "undermine [IBM's] own promise" to the IBM sales representatives. *Id.* at 2. In particular,

Kingston asserted that to "change the plan after the game is over is not fair, and no one can rationalize it otherwise honestly." *Id.* at 1. Kingston strenuously argued that IBM should not go forward with Leeke's proposal or engage in arbitrary capping in general: "Plus it's just not an honorable way for a [*sic*] ethical company to react. I believe in honest, fairness, and integrity. We have a team that believes in us. If we don't handle this better, none of them will trust us again. We need to reconsider this." *Id.* at 2.

IBM's arguments to the contrary are unpersuasive. First, IBM cites *Jensen v. IBM*, 454 F.3d 382 (4th Cir. 2006). IBM argues that *Jensen* "addressed this very situation" and forecloses Swafford's ability to prove intent to defraud. Mot. at 16–17. However, *Jensen* is inapposite. *Jensen* only involved a breach of contract claim in which intent to deceive was not an element. 454 F.3d at 386. In *Jensen*, the Fourth Circuit held that the IPL disclaimers rendered IBM's actions permissible under the alleged contract. *Id.* at 389. *Jensen* said nothing, however, about intent to defraud.

Second, IBM cites *Vinson v. IBM*, 2018 WL 4608250 (M.D.N.C. Sep. 25, 2018), and *Schwarzkopf v. IBM*, 2010 WL 1929625 (N.D. Cal. May 12, 2010), for the proposition that the IPL's disclaimers foreclose "the argument that IBM intended to deceive him regarding the payment of his commissions." Mot. at 16. However, the section of *Vinson* that IBM cites discusses only breach of contract. *Id.*; *Vinson*, 2018 WL 4608250, at *5. To the extent that the *Vinson* court actually discussed intent to defraud in the context of PowerPoint statements similar to the ones in the instant case, the *Vinson* court *upheld* the plaintiff's allegation notwithstanding the IPL's disclaimers. *Id.* at *10. Accordingly, *Vinson* cuts against IBM's argument in the instant case.

*Schwarzkopf* is also inapposite. Unlike the instant case, the sole alleged fraudulent misrepresentations in *Schwarzkopf* came from the plaintiff's managers, and the *Schwarzkopf* court concluded that these managers lacked the intent to defraud the plaintiff based on the managers' efforts to ensure that the plaintiff received full commissions. *Schwarzkopf*, 2010 WL 1929625, at

United States District Court
Northern District of California

*14.  However, in the instant case, as outlined above, Swafford has identified evidence in the record that supports intent to defraud on the part of IBM.

IBM broadly argues that the fact that IBM disclosed the disclaimers in the IPL precludes any finding of intent to defraud.  Mot. at 16.  The Court already rejected this argument.  As the Court previously held, and as other courts have held in similar situations, "the IPL disclaimers do not reveal IBM's motivation for informing sales representatives in the PowerPoint presentation . . . that commissions were uncapped."  ECF No. 69 at 12; *see also Fessler v. IBM*, 2018 WL 6220209, at *6 (E.D. Va. Nov. 28, 2018) ("But these [IPL] disclaimers do not reveal IBM's motivation for informing salespeople that commissions were uncapped.").  The fact that IBM provided Swafford with the disclaimers in the IPL does not mean IBM lacked an intent to defraud.

Accordingly, the Court concludes that there is a genuine issue of material fact as to whether IBM possessed an intent to defraud Swafford when IBM stated in the 2H 2016 PowerPoint presentation that "payments" and "earning opportunit[ies]" were uncapped.  The Court proceeds to consider whether there is a genuine issue of material fact as to whether Swafford reasonably relied on these statements.

### 3.  There Is a Genuine Issue of Material Fact with Respect to Whether Swafford Reasonably Relied on IBM's Statements.

IBM argues that even if a jury could find that the allegedly fraudulent statements in the 2H 2016 PowerPoint presentation were false and made with the intent to defraud Swafford, there is no genuine issue of material fact that could show that Swafford reasonably relied on these statements.  Mot. at 17.  IBM claims that the IPL, and particularly the Significant Transactions provision contained within it, should have clarified for Swafford the fact that Swafford's commissions could be reduced.  *Id.*  IBM also argues that the record demonstrates that Swafford was fully aware of the fact that Swafford's commissions in the second half of 2016 would be reviewed and potentially reduced.  *Id.* at 17–18.

Swafford responds by arguing that the applicability of the Significant Transactions provision is irrelevant to whether Swafford reasonably relied on the allegedly fraudulent

20

statements. Opp. at 23. According to Swafford, if the allegedly fraudulent statements in the 2H 2016 PowerPoint presentation and the IPL provisions were inconsistent, Swafford should not have been expected to understand as a matter of law that the IPL controlled. *Id.* at 22.

The Court agrees with Swafford. There is sufficient evidence in the record to establish a genuine issue of material fact with respect to whether Swafford reasonably relied on the allegedly fraudulent statements in the 2H 2016 PowerPoint presentation.

Under California law, "the reasonableness of the reliance is ordinarily a question of fact." *Guido v. Koopman*, 1 Cal. App. 4th 837, 843 (1991). Indeed, California courts have repeatedly held that "[e]xcept in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the questions of whether a plaintiff's reliance is reasonable is a question of fact." *Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995) (quoting *Blankenheim v. E.F. Hutton & Co.*, 217 Cal. App. 3d 1463, 1475 (1990)); *see also Beard*, 2019 WL 1516592, at \*4 ("It will be a question of fact for the jury whether reliance was reasonable."). Notwithstanding this case law, IBM asserts that in the instant case, "any reliance on any alleged false statements [was] unreasonable as a matter of law" on the part of Swafford. Mot. at 19.

As an initial matter, IBM points to the fact that Swafford was required to read and review the IPL, which contained the Significant Transactions provision. According to IBM, this provision should have alerted Swafford to the fact that "IBM could review his commissions on significant transactions and that his commissions were not earned until any review was complete." Mot. at 17. As the Court outlined above, however, there is sufficient evidence in the record to support the conclusion that the allegedly fraudulent statements in the 2H 2016 PowerPoint presentation were false and inconsistent with the IPL disclaimers such as the Significant Transactions provision. *See supra* III.A.1. In light of this fact, and as the Court previously explained in its Order on the Motion to Dismiss, "IBM should not be allowed to make inconsistent representations and then insist that, as a matter of law, its sales representatives were incorrect to rely on IBM's representations." ECF No. 69 at 13.

Indeed, IBM does not assert that the IPL was a binding contract or that the IPL's statements should be legally privileged above the statements in the 2H 2016 PowerPoint presentation in any way. Further, the fact that Swafford was required to read the IPL is irrelevant. While Swafford was indeed required to sign off on the IPL, Swafford was *also* required to review and sign off on the 2H 2016 PowerPoint presentation. *See* 2H 2016 PowerPoint presentation at 18 ("When you accept your letter you will also again be asked to confirm that you completed your incentive plan education here on Incentives Workplace."). In fact, the record contains affirmative evidence that in the case of a conflict between the IPL and the statements in the 2H 2016 PowerPoint presentation, IBM employees would reasonably understand that the *statements in the 2H 2016 PowerPoint presentation* control. Swafford points to the fact that the 2H 2016 PowerPoint presentation expressly indicates that the 2H 2016 PowerPoint presentation itself "is the *primary 2016 education* for IBM sales employees." *Id.* at 1 (emphasis added).

IBM also mischaracterizes the significance of Swafford's apparent knowledge of the review process. The record indicates that IBM previously reviewed Swafford's commissions in 2015. Mot. at 17. Although Swafford was ultimately paid his full commissions in 2015, IBM nonetheless claims that this previous process put Swafford "on notice that his commissions on large deals were subject to review by IBM." *Id.* at 17–18. However, Swafford testified that Swafford believed that the review was strictly for the purposes of determining that all of the relevant transactions underlying the commissions were "clean." *See* Swafford Depo. at 129:14–15. Specifically, Swafford assumed that the purpose of the review "was to fix errors," and to "make sure a contract is signed, the amounts are correct, and—you know, and no decimal points missing, no approvals missing." *See id.* at 51:18–23. In short, Swafford apparently believed that the purpose of the automatic internal review was to fix clerical errors associated with the underlying transactions. *See id.*

Finally, IBM cites *Fessler v. IBM Corp.*, 2018 WL 6220209 (E.D. Va. No. 28, 2018), and *Middleton v. IBM Corp.*, 2019 LEXIS 61308 (N.D. Ga. Jan. 2, 2019), for the proposition that

United States District Court
Northern District of California

"disclaimers in the IPL foreclose reliance on any alleged statements to the contrary contained outside the IPL." Mot. at 18. The Court previously squarely rejected the applicability of these two cases. In its previous Order on the Motion to Dismiss, the Court explained that "*Fessler* is inconsistent and conclusory because the *Fessler* court simultaneously found that the IPLs were not a contract, but nonetheless the IPLs' statements bound the plaintiff as a matter of law." ECF No. 69 at 15. Further, the Court explained that *Middleton* "is distinguishable because the Northern District of Georgia emphasized that *under the law of its circuit*, 'a disclaimer can render reliance unreasonable as a matter of law and, here, the IPL is wrought with disclaimers that bar Plaintiff from claiming justifiable reliance.'" *Id.* These two decisions remain inapposite for the same reasons that the Court articulated in its Order on the Motion to Dismiss.[4]

Accordingly, the Court concludes that there is a genuine issue of material fact with respect to whether Swafford reasonably relied on the allegedly fraudulent statements in the 2H 2016 PowerPoint presentation. Because there are multiple genuine issues of material fact, the Court DENIES IBM's motion for summary judgment on Swafford's fraudulent misrepresentation claim. The Court proceeds to consider whether summary judgment is appropriate with respect to the negligent misrepresentation claim.

**C. There Is a Genuine Issue of Material Fact with Respect to Whether IBM Committed Negligent Misrepresentation.**

IBM also moves for summary judgment on Swafford's claim for negligent misrepresentation. California recognizes a claim for negligent misrepresentation, which, unlike fraudulent misrepresentation, allows recovery in the absence of scienter or intent to defraud. *Los*

---

[4] In a separate statement of recent decision, IBM also directs the Court to a "*per curium* [*sic*] decision of the United States Court of Appeals for the Eleventh Circuit, in the case titled *Christopher Middleton v. IBM*, Case No. 19-11824, affirming the District Court's dismissal of Middleton's Amended Complaint." ECF No. 93. However, the Eleventh Circuit's unpublished *Middleton* decision is inapposite for the same reason that the district court's decision is: the Eleventh Circuit relies on the principle under Georgia law that "the mere presence of a disclaimer, regardless of whether or not the plaintiff saw it, can render reliance unreasonable." *Middleton v. IBM*, 2019 WL 4724477, at *3 (11th Cir. Sept. 26, 2019) (cleaned up). Because the instant case is not governed by Georgia law, the Eleventh Circuit's unpublished decision is similarly inapposite.

Case No. 18-CV-04916-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

*Angeles Unified School Dist. v. Great American Ins. Co.*, 49 Cal. 4th 739, 750 n.5 (2010). The elements of negligent misrepresentation are: (1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) reasonable reliance on the misrepresentation, and (5) resulting damage. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Cambridge Integrated Servs.*, 171 Cal. App. 4th 35, 50 (2009).

IBM argues that Swafford's negligent misrepresentation claim fails for two of the reasons that IBM argues Swafford's fraudulent misrepresentation fails: Swafford has not identified a genuine issue of material fact with respect to whether the statements in the 2H 2016 PowerPoint presentation were false, or whether Swafford reasonably relied on them. *See* Mot. at 19. Because the Court has concluded that Swafford has indeed established genuine issues of material fact with respect to these two elements, the Court also DENIES IBM's motion for summary judgment on Swafford's negligent misrepresentation claim. The Court proceeds to consider Swafford's claims for quantum meruit and unjust enrichment.

**D. There Is a Genuine Issue of Material Fact with Respect to Whether IBM Is Liable for Quantum Meruit and Unjust Enrichment.**

Next, IBM argues that IBM is entitled to summary judgment on Swafford's claims for quantum meruit and unjust enrichment. In particular, IBM claims that Swafford is entitled to summary judgment on these claims because Swafford cannot show that Swafford reasonably expected compensation beyond what Swafford ultimately received. Mot. at 20. IBM also argues that IBM paid Swafford enough money in commissions in the second half of 2016 to bar a finding of unjust enrichment, and IBM claims that other courts have rejected quantum meruit and unjust enrichment claims in similar circumstances. *Id.*

Swafford responds that Swafford can point to a reasonable expectation of additional compensation. Opp. at 25. Swafford also responds by arguing that the fact that IBM paid Swafford a lower sum for commissions in the second half of 2016 is not a defense to the unjust enrichment claim, and Swafford distinguishes the case law that IBM cites. *Id.*

24

The Court agrees with Swafford's arguments. There is a genuine issue of material fact with respect to whether Swafford reasonably relied on the allegedly fraudulent statements contained within the 2H 2016 PowerPoint presentation. Further, the money that Swafford received in the form of commissions in the second half of 2016 is not a defense to the quantum meruit and unjust enrichment claims. Finally, the case law that IBM cites to argue that summary judgment is appropriate is distinguishable.

Quantum meruit (or quasi-contract) "is an equitable remedy implied by the law under which a plaintiff who has rendered services benefitting the defendant may recover the reasonable value of those services when necessary to prevent unjust enrichment of the defendant." *In re De Laurentiis Ent. Grp. Inc.*, 963 F.2d 1269 (9th Cir. 1992). To prevail on a claim for quantum meruit, Swafford must show: (1) that he performed certain services for IBM; (2) that the services were rendered at IBM's request; and (3) that they are unpaid. *Summit Estate, Inc. v. Cigna Healthcare of Cal. Inc.*, 2017 WL 4517111, at *11 (N.D. Cal. Oct. 10, 2017) (citations omitted). Under California law, quantum meruit also requires evidence of a plaintiff's reasonable expectation of receiving compensation for services rendered. *See Huskinson & Brown v. Wolf*, 32 Cal. 4th 453, 458 (2004) ("To recover in quantum meruit, a party need not prove the existence of a contract, but it must show the circumstances were such that 'the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made.'" (citations omitted)).

In California, "unjust enrichment is not a standalone cause of action." *In re Safeway Tuna Cases*, 2016 WL 3743364, at *1 (N.D. Cal. July 13, 2016). However, the Ninth Circuit has previously recognized that "[w]hen a plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a quasi-contract claim seeking restitution.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (quoting *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221 (2014)). In its order denying IBM's motion to dismiss, the Court construed Swafford's unjust enrichment claim as a quasi-contract claim seeking restitution. Order at 17.

United States District Court
Northern District of California

The Ninth Circuit has explained that unjust enrichment and restitution "describe the theory underlying a claim that a defendant has been unjustly conferred a benefit through mistake, fraud, coercion, or request" or a situation where "restitution require[s] a party to return a benefit when the retention of such benefit would unjustly enrich the recipient." *Astiana*, 783 F.3d at 762 (quotation marks and citations omitted).

The Court considers IBM's arguments for summary judgment on these claims in turn.

First, IBM points to the fact that quantum meruit in California requires a showing of a reasonable "understanding or expectation" on the part of Swafford that additional compensation would be conferred for his efforts. Mot. at 20. According to IBM, because Swafford cannot point to a genuine issue of material fact that Swafford reasonably relied on the allegedly fraudulent statements contained within the 2H 2016 PowerPoint presentation, Swafford cannot fulfill this requirement. *Id.* However, the Court previously concluded that Swafford has indeed identified a genuine issue of material fact as to reasonable reliance. *See supra* Part III.B.3. Thus, IBM's argument fails.

Second, IBM points to the fact that IBM paid Swafford "over $700,000 in commissions for the second half of 2016," including "full commissions for other deals that closed during the second half of 2016." Mot. at 20. IBM argues that these other payments preclude Swafford from proving that IBM received an unjustly conferred benefit at Swafford's expense, as required for Swafford to succeed on the quasi-contract claim seeking restitution. *Id.* IBM is incorrect.

As outlined above, Swafford has identified genuine issues of material fact that IBM committed fraudulent misrepresentation and thereby wrongly enriched itself by withholding commissions on the Oracle and Sabre deals. The amount of money that Swafford did receive in the form of commissions across all of the transactions in the second half of 2016 is irrelevant. Indeed, under the California law of restitution, "[t]he emphasis is on the wrongdoer's enrichment, not the victim's loss." *County of San Bernardino v. Walsh*, 158 Cal. App. 4th 533, 543 (2007); *see also Brooks v. Motsenbocker Advanced Developments, Inc.*, 2008 WL 2826392, at *8 (S.D.

26

Cal. July 21, 2008) ("If Defendants deceived Plaintiffs into performing work in connection with the promotion and sales of the Product and Finish Coat, Defendants would be unjustly enriched if the 10% commission promised to Plaintiffs went into Defendants' pockets."). IBM cites no case law in support of its position to the contrary. Because Swafford has shown genuine issues of material fact that IBM fraudulently misrepresented the nature of the commissions and thereby enriched itself at Swafford's expense, Swafford's restitution claim is not suitable for summary judgment. *See Beard v. IBM*, 2019 WL 1516592, at \*6 (N.D. Cal. Apr. 7, 2019) (holding that because a plaintiff "sufficiently alleged that he provided IBM with a benefit for which he was not fairly compensated," dismissal of unjust enrichment claim was inappropriate).

Finally, the case law that IBM cites in general support of its position is inapposite. IBM points to five cases: *Snyder v. IBM*, No. 1:16-cv-03596-WMR, 2019 U.S. Dist. LEXIS 66583, at \*13-16 (N.D. Ga. Mar. 18, 2019); *Morris v. IBM Corp.*, No. 1:18-cv-0042-LY, 2018 U.S. Dist. LEXIS 222568, at \*9-11 (W.D. Tex. Nov. 29, 2018); *Middleton*, 2019 U.S. Dist. LEXIS 61308, at \*15-17; *Fessler*, 2018 U.S. Dist. LEXIS 202725, at \*13-15; and *Pero v. IBM Corp.*, No. 12-CV-07484 (KM), 2014 U.S. Dist. LEXIS 2461 (D.N.J. Jan. 2, 2014). First of all, as a general matter, none of these cases involved claims for quantum meruit or restitution under California law. Second, as IBM itself concedes, the cases that IBM cites rely on the "disclaimers in IBM's commission plans" for the proposition that IBM employees were on notice that their commissions could be reduced. Mot. at 20; *see, e.g.*, *Snyder v. IBM*, 2019 U.S. Dist. LEXIS 66583, at \*15 ("Here, the plain terms of Plaintiff's IPLs foreclose any reasonable expectation that he would a [*sic*] specific amount of commissions."). However, as explained above, in the instant case, Swafford has established a genuine issue of material fact as to reasonable reliance notwithstanding the language in the IPL. *See supra* Part III.B.3. Third, and relatedly, only two of the decisions cited by IBM address statements similar to the ones contained within the 2H 2016 PowerPoint presentation: *Middleton*, 2019 U.S. Dist. LEXIS 61308, at \*15-17, and *Fessler*, 2018 U.S. Dist. LEXIS 202725, at \*13-15. As the Court previously explained, and for the reasons previously

United States District Court
Northern District of California

stated, "*Fessler* and *Middleton* are not persuasive." ECF No. 69 at 15; *see supra* Part III.B.3.

The Court concludes that Swafford has established a genuine issue of material fact with respect to his claims for quantum meruit and unjust enrichment. Accordingly, the Court DENIES IBM's motion for summary judgment on these claims. The Court proceeds to consider Swafford's claim for violation of the UCL.

### E. There Is a Genuine Issue of Material Fact with Respect to Whether IBM Violated the UCL.

IBM argues that IBM is entitled to summary judgment on Swafford's claim under California's UCL, Cal. Bus. & Prof. Code § 17200, *et seq.* The UCL creates a cause of action for business practices that are (1) unlawful, (2) unfair, or (3) fraudulent. Each "prong" of the UCL provides a separate and distinct theory of liability. *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007). Swafford's UCL claim is based on all three prongs.

IBM moves for summary judgment on Swafford's UCL claim in its entirety because IBM asserts that, to the extent Swafford's UCL claim is derivative of Swafford's other claims, Swafford cannot establish an underlying unlawful, unfair, or fraudulent practice. Mot. at 21–23; *see Cel-Tech Commc'ns., Inc. v. L.A. Cellular Telephone Co.*, 20 Cal. 4th 163, 180 (1999) (explaining that the UCL effectively "'borrows' violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable."). The Court discusses each prong below.

#### 1. There Is a Genuine Issue of Material Fact with Respect to Whether IBM Violated the Unfair and Fraudulent Prongs of the UCL.

Swafford's UCL claim under the unfair and fraudulent prongs relies on his misrepresentation and quantum meruit/unjust enrichment claims. Specifically, Swafford alleges that IBM knowingly misrepresented to Swafford the uncapped nature of his sales commissions and that IBM willfully failed to pay all earned commissions to Swafford. SAC ¶¶ 59-60.

"A business practice is unfair within the meaning of the UCL if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to

consumers which outweighs its benefits." *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1473 (2006). In determining whether a practice is unfair, California courts examine the practice's impact on its alleged victim and balance that impact against the reasons, justifications, and motives of the alleged wrongdoer. *Id.* To state a claim under the fraudulent prong of the UCL, plaintiffs must prove "actual reliance on the allegedly deceptive or misleading statements," *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 312, 326 (2011), and that "the misrepresentation was an immediate cause of the injury-producing conduct," *In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009).

IBM's sole argument for summary judgment on Swafford's UCL claim under the unfair and fraudulent prongs is that "Plaintiff's claims for fraudulent and negligent misrepresentation and quantum meruit and unjust enrichment fail." Mot. at 21. However, the Court has concluded that there are genuine issues of material fact precluding summary judgment on these claims. *See supra* Parts III.B, C, D. Accordingly, the Court DENIES IBM's motion for summary judgment on Swafford's UCL claim under the unfair and fraudulent prongs. The Court proceeds to consider whether summary judgment is appropriate with respect to Swafford's UCL claim under the unlawful prong.

### 2. There Is a Genuine Issue of Material Fact with Respect to Whether IBM Violated the Unlawful Prong of the UCL.

The unlawful prong of the UCL prohibits "anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel-Tech Commc'ns., Inc.*, 20 Cal. 4th at 180. In the instant case, Swafford alleges that IBM violated the unlawful prong of the UCL by violating "California Labor Code Sections 200, 201, 202, 204, and 2751 and the applicable Industrial Welfare Commission Wage Orders." SAC ¶ 58.

IBM argues that summary judgment is appropriate with respect to UCL violations premised on violations of California Labor Code Sections 200, 201, 202, and 204 because Swafford has presented no evidence that these provisions apply in the instant case. Mot. at 22–23. Swafford concedes that summary judgment in IBM's favor is appropriate with respect to IBM's

29

alleged violation of the UCL on the basis of these provisions. Opp. at 28 n.20. Accordingly, the Court GRANTS IBM's motion for summary judgment with respect to Swafford's UCL claim insofar as the claim is premised on IBM's violations of California Labor Code Sections 200, 201, 202, and 204.

IBM also argues that IBM is entitled to summary judgment on Swafford's UCL claim insofar as the claim is premised on IBM's violation of California Labor Code Section 2751. According to IBM, the IPL satisfies the requirements of California Labor Code Section 2751 because it sets forth the manner in which commissions are calculated and paid, because both Swafford and IBM endorsed the document, and because Swafford has not offered evidence that Swafford was harmed by the alleged violation. Mot. at 23.

In response, Swafford claims that the IPL is not a contract and therefore cannot satisfy the requirements of California Labor Code Section 2751. Swafford also argues that the IPL violates the requirements of California Labor Code Section 2751 because IBM did not actually sign the IPL. Opp. at 27.

For the reasons stated below, the Court agrees with Swafford that the IPL is not a contract and that the IPL therefore cannot satisfy the requirements of California Labor Code Section 2751. Accordingly, the Court need not reach Swafford's argument that IBM did not sign the document for the purposes of the statute.

California Labor Code Section 2751 dictates that "[w]henever an employer enters into a contract of employment with an employee for services to be rendered within this state and the contemplated method of payment of the employee involves commissions, the contract shall be in writing and shall set forth the method by which the commissions shall be computed and paid." Cal. Lab. Code § 2751(a). In the instant case, the record is clear that Swafford was employed by IBM and the "contemplated method of payment" of Swafford in his role at IBM involved commissions. *See, e.g.*, Swafford Depo. at 52:12–19 (outlining the process whereby Swafford received commissions from IBM). Thus, the requirements of California Labor Code Section 2751

United States District Court
Northern District of California

clearly apply to Swafford.

IBM argues that IBM complied with the requirements of California Labor Code section 2751. According to IBM, "Plaintiff's IPL is in writing, explained how his commissions were paid, and was signed by Plaintiff, as Plaintiff admitted, thus meeting the requirements of § 2751." Reply at 11–12. However, California Labor Code Section 2751 specifically demands that a "contract" satisfy the requirements outlined by the provision. Cal. Lab. Code § 2751(a). It is undisputed that the IPL is not a contract. *See, e.g.*, ECF No. 69 at 13 ("IBM repeatedly states that the IPL is not a contract and that the IPL does not create any obligations for IBM."). Thus, the IPL cannot satisfy the requirements of California Labor Code Section 2751. *See Piccarreto v. Prestek, LLC*, 2017 WL 3671153, at *2 (C.D. Cal. Aug. 24, 2017) ("California Labor Code Section 2751 requires that whenever an employer enters into a contract of employment with an employee, the employer must provide a *written contract* to the employee if the employee's payment involves commissions for services rendered in California." (emphasis added)); *Abrishamcar v. Oracle Am.*, 2018 Cal. Super. LEXIS 4155, at *4 (Apr. 4, 2018) (explaining that Section 2751 requires that a "fully signed contract must be given to the employee").

IBM cites a single case for the proposition that, notwithstanding the clear language and import of California Labor Code Section 2751, employers may fulfill the terms of the provision without a contract. However, that case, *Keenan v. Cox Comms. Cal., LLC*, 2019 U.S. Dist. LEXIS 121819, at *25–26 (S.D. Cal. July 22, 2019), stands for no such proposition. The *Keenan* court simply dismissed the plaintiff's claim under California Labor Code Section 2751 because the court determined that "any monetary remedy for violation of section 2751 is available only in the form of penalties under PAGA," which the plaintiff had not brought in that case. *Id.* at *27. The mere fact that the *Keenan* court used the word "agreement" instead of "contract" in the course of arriving at an unrelated conclusion is meaningless. In any event, even if the statute were not clear, California law dictates that "statutes governing conditions of employment are to be construed broadly in favor of protecting employees." *Murphy v. Kenneth Cole Prods., Inc.*, 40 Cal. 4th

31

1094, 1103 (2007).  The Court concludes that the IPL cannot satisfy the requirements of California Labor Code Section 2751.

Accordingly, the Court DENIES IBM's motion for summary judgment with respect to Swafford's UCL claim insofar as the claim is premised on IBM's alleged violation of California Labor Code Section 2751.[5]  Finally, the Court proceeds to consider Swafford's claim for punitive damages.

### F.  There Is a Genuine Issue of Material Fact with Respect to Whether Swafford Is Entitled to Punitive Damages.

Finally, IBM argues that IBM is entitled to summary judgment on Swafford's claim for punitive damages because it is derivative of Swafford's fraudulent misrepresentation claim.  *See* Mot. at 23.  Swafford acknowledges that his claim for punitive damages is derivative of his fraudulent misrepresentation claim.  Opp. at 28.  However, because the Court denied IBM's motion for summary judgment on Swafford's fraudulent misrepresentation claim in the instant Order, the Court also DENIES IBM's motion for summary judgment on Swafford's punitive damages claim.

## IV.  CONCLUSION

For the foregoing reasons, the Court rules as follows on IBM's motion for summary judgment:

- To the extent the fraudulent misrepresentation claim is based on the oral statements by

[5] In his opposition, Swafford suggests that "this Court can and should grant summary judgment to Swafford under Rule 56(f)" for Swafford's claim under the unlawful prong of the UCL.  Opp. at 28.  Under Federal Rule of Civil Procedure 56(f)(1), a Court may grant summary judgment for a nonmovant after giving notice and a reasonable time to respond.  Grants of summary judgment to a nonmoving party, however, are "generally disfavored, because they risk depriving a losing party of adequate notice and opportunity to oppose summary judgment." *Mikkelsen Graphic Engineering, Inc. v. Zund Am., Inc.*, 541 F. App'x 964, 972 (Fed. Cir. 2013); *see also Kassbaum v. Steppenwolf Prods., Inc.*, 236 F.3d 487, 494 (9th Cir. 2000) (explaining that "great care must be exercised to assure that the original movant has had an adequate opportunity to show that there is a genuine issue and that his [or her] opponent is not entitled to judgment as a matter of law").  Because the parties' briefing focused only on the issue of the IPL's relevance to California Labor Code Section 2751, the Court DENIES Swafford's request for summary judgment under Rule 56(f).

IBM executives and managers, the motion for summary judgment is GRANTED;

- To the extent the fraudulent misrepresentation claim is based on the statements contained within the 2H 2016 PowerPoint presentation, the motion for summary judgment is DENIED;

- The motion for summary judgment on the negligent misrepresentation claim is DENIED;

- The motion for summary judgment on the quantum meruit and unjust enrichment claims is DENIED;

- The motion for summary judgment on the UCL claim based on the unfair and fraudulent prongs is DENIED;

- The motion for summary judgment on the UCL claim based on the unlawful prong to the extent the unlawful prong is predicated on violations of California Labor Code §§ 200, 201, 202, and 204 is GRANTED;

- The motion for summary judgment on the UCL claim based on the unlawful prong to the extent the unlawful prong is predicated on a violation of California Labor Code § 2751 is DENIED;

- The motion for summary judgment on the punitive damages claim is DENIED.

**IT IS SO ORDERED.**


Dated:  October 11, 2019

_____
LUCY H. KOH
United States District Judge

Case No. 18-CV-04916-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT